[No. C030917. Third Dist. Mar. 28, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
HILARIO LARRY SANDOVAL et al., Defendants and Appellants.

COUNSEL

Mark L. Christiansen, under appointment by the Court of Appeal, for Defendant and Appellant Hilario Larry Sandoval.

Lynne S. Coffin, Public Defender, under appointment by the Court of Appeal, Jeffrey J. Gale, Chief Assistant Public Defender, and Leslie Evans, Deputy Public Defender, for Defendant and Appellant Curley Carlisle.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, J. Robert Jibson and John A. O'Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

NICHOLSON, J.—When a witness who testified at the preliminary hearing is unavailable to testify at trial, it is statutorily and constitutionally acceptable for the former testimony to be used at trial. (See Evid. Code, § 1291; *Ohio v. Roberts* (1980) 448 U.S. 56 [100 S.Ct. 2531, 65 L.Ed.2d 597].) This case presents the question whether the prosecution, to establish the unavailability of a crucial witness who is a Mexican citizen currently residing in Mexico, must show it made a reasonable, good faith effort to obtain the attendance of the witness at trial. We conclude the defendants' right of confrontation requires such a showing. Since no such showing was made here, we reverse the defendants' convictions for murder and related crimes.

## BACKGROUND

The defendants, Hilario Larry Sandoval and Curley Carlisle, were charged with the murder of Joaquin Zavala and the attempted robbery of Joaquin Zavala, Elias Zavala, and Francisco Camacho-Trejo, along with other related crimes. They were tried by jury. Upon proof that Elias Zavala, an actual witness to the alleged crimes and brother of the shooting victim, was a Mexican citizen and was residing in Mexico at the time of trial, the trial court allowed the prosecution to present the transcript of his preliminary hearing to the jury. The jury found the defendants guilty as charged. The trial court sentenced each defendant to life in state prison without possibility of parole. The defendants also received determinate terms for the related crimes and enhancements. Both appeal.

The prosecution presented the preliminary hearing testimony of Elias Zavala and the live trial testimony of Francisco Camacho-Trejo. They were the only two actual witnesses of the shooting, other than the defendants.

*Preliminary Hearing Testimony of Elias Zavala*

On January 23, 1997, Elias Zavala lived in an apartment on T Street with his brother Joaquin and their friend, Francisco Camacho-Trejo. (Hereafter references to Zavala are to Elias.) Zavala and Camacho-Trejo arrived at the apartment and found the defendants waiting at the door. Joaquin opened the door from the inside, and all four men entered the apartment. Zavala knew Sandoval but did not know Carlisle. Sandoval told Zavala to loan him some money, to which Zavala responded that he did not have any. Zavala, not recognizing Carlisle, asked who he was. Sandoval said he was his cousin, but Zavala laughed because he did not believe him. (Sandoval is Hispanic, and Carlisle is Black.)

Sandoval pulled out a revolver and told Zavala to give him everything he had. Carlisle pulled out a shotgun and pointed it at Joaquin, who was coming out of a back room. Carlisle told Joaquin not to move, then he fired at Joaquin. Zavala ran to his brother, who was bleeding from a wound to the chest. Zavala grabbed a gun that was under a bed, about a half-meter from Joaquin, and ran after Sandoval and Carlisle. He shot at them as they got into a truck and drove away.

Zavala claimed drugs were not being sold from his apartment, although he conceded that Sandoval had purchased drugs from a friend who had been at Zavala's apartment. On cross-examination, however, Zavala conceded he had sold drugs to Sandoval before. Zavala also stated he had taken "crank" on the day of the shooting and was still under the influence when the shooting occurred.

After the defendants left, Zavala gave the gun to Camacho-Trejo to discard. However, he lied to the police and claimed he had thrown it away in a field.

Zavala testified that charges brought against him were dismissed because he testified at the preliminary hearing. While he admitted he was from Mexico and in this country illegally, he did not specify what the charges against him had been.

*Trial Testimony of Francisco Camacho-Trejo*

On January 23, 1997, Francisco Camacho-Trejo was also an illegal alien, living with Joaquin and Elias Zavala. The three spoke only Spanish and understood very little English. Camacho-Trejo returned home from the store as the defendants were arriving at the apartment. Inside the apartment,

Sandoval told Zavala to "give him what he had." Zavala replied that he did not have anything, but Sandoval repeated his request and pulled a gun out of his waistband. Carlisle pulled a shotgun out of the sleeve of his jacket.

Carlisle pointed the shotgun at Joaquin, who was in the hallway coming from the back room. Camacho-Trejo, however, could not see Joaquin from where he was standing because a wall separated them. Carlisle yelled at Joaquin, saying something Camacho-Trejo did not understand and then fired the shotgun. Zavala went to Joaquin, while Carlisle pointed the shotgun at Camacho-Trejo and told him to open the door. The defendants fled the apartment. After the defendants were gone, Zavala gave Camacho-Trejo three bags and told him to throw them away. Camacho-Trejo put the bags in the garbage in a neighbor's apartment. Although he told an officer that one of the bags contained a gun, he denied at trial knowing there was a gun in one of the bags. He was impeached with his preliminary hearing testimony in which he stated that Zavala gave him the gun and told him to hide it or throw it away.

When Camacho-Trejo was questioned the day of the shooting, he claimed he had not been in the apartment at the time. In later questioning, he stated that Joaquin had a stick in his hands. At the preliminary hearing, he testified that Joaquin had a gun. Finally, at trial, he claimed he had seen nothing in Joaquin's hands. Under questioning from the prosecution, Camacho-Trejo denied he had ever told a defense investigator that Joaquin went into the bedroom and came out with a gun or that, just before Carlisle shot Joaquin, someone was shouting at him to put down the gun. He did, however, hear the shots Zavala fired at the defendants as they fled.

Camacho-Trejo testified under a grant of immunity from prosecution for anything arising from his testimony. He denied that Zavala sold drugs. However, he was impeached with his preliminary hearing testimony in which he stated that Zavala had sold Sandoval heroin in the past. In fact, during the preliminary hearing, Camacho-Trejo testified that he understood Sandoval was asking for heroin when he demanded that Zavala give him what he had because that is what Zavala had sold to Sandoval in the past.

*Defense*

Carlisle testified, but Sandoval did not. Carlisle stated that, on the night of the shooting, Sandoval, who was sick with heroin withdrawal, asked him to drive him around to find some heroin to purchase. Carlisle took a sawed-off shotgun to exchange for drugs. They knocked on the door of the Zavala apartment just as Zavala and Camacho-Trejo approached. Joaquin opened

the door from inside and let them in. Sandoval spoke to the occupants of the apartment in Spanish, which Carlisle did not understand. The conversation became heated.

Joaquin went into a bedroom. Zavala pulled out a gun and said something to Joaquin, who came out of the bedroom with a gun aimed at Carlisle. Looking at Carlisle, Joaquin cocked the gun and said something in Spanish that Carlisle did not understand. Carlisle told Sandoval that there was a guy coming out of the back room with a gun, and Sandoval told Carlisle to show him the shotgun. Carlisle thought he meant they were going to trade the shotgun for drugs. As Carlisle was taking the shotgun out from under his coat and unwrapping a towel that was around it, the shotgun accidentally discharged. Although he testified that he feared for his life when Joaquin pointed the gun at him, Carlisle claimed that the shooting was accidental, not in self-defense. Carlisle and Sandoval could not get the apartment door open, so they told Camacho-Trejo to open it. Shots were fired at them after they left the apartment.

Carlisle was impeached with his statement to a detective that he had not been involved in the shooting. He sustained prior convictions for auto theft and felony hit and run with an injury.

### Closing Argument

During closing argument, the prosecutor focused on how the evidence supported an attempted robbery conviction and therefore a murder conviction under the felony-murder rule. She argued specifically that the facts of the shooting did not constitute self-defense, both because the truth was that Joaquin did not have a gun and because, even if he had a gun, Carlisle and Sandoval were the aggressors.

Counsel for Sandoval argued that Carlisle and Sandoval were at the apartment to trade the shotgun for heroin that Sandoval wanted because he was in narcotics withdrawal. They were not there to rob Zavala. The situation became heated when Zavala got nervous about Carlisle, someone Zavala did not know, being brought to the apartment. The main theme of the argument was that there was no attempted robbery, so Sandoval bore no criminal responsibility for the shooting.

Counsel for Carlisle also argued that Carlisle and Sandoval did not go to the apartment to rob its occupants. He asserted that Joaquin came out of the bedroom pointing a gun at Carlisle, and counsel asked: "Did [Carlisle] panic when he heard the click, did [Carlisle] panic when he saw the gun? Maybe.

Did he fire in self-defense? Maybe. Did the gun go off accidentally? Maybe. From the evidence you've heard, you may reasonably infer any of those scenarios, any of those results." In the alternative, counsel argued Carlisle was not guilty of attempted robbery as an aider and abettor because he did not know Sandoval intended to rob the men.

## DISCUSSION

■ We "independently review a trial court's determination that the prosecution's failed efforts to locate an absent witness are sufficient to justify an exception to the defendant's constitutionally guaranteed right of confrontation at trial." (*People v. Cromer* (2001) 24 Cal.4th 889, 901 [103 Cal.Rptr.2d 23, 15 P.3d 243].) While *Cromer* speaks solely of failed efforts to *locate* an absent witness, there is no logical reason not to apply the independent review standard to failed efforts to *obtain the attendance* of a witness at trial. (See *Ohio v. Roberts, supra,* 448 U.S. at pp. 74-75 [100 S.Ct. at p. 2543] [requiring good faith effort to "locate and present" the witness].)

While in custody on drug charges, Zavala testified at the preliminary hearing. In exchange for his testimony, charges against him were dismissed on motion of the prosecution. Because of his immigration status, the United States government deported Zavala to his native Mexico.

Before trial, the court held a hearing concerning the admissibility of Zavala's former testimony. The facts adduced at that hearing are not in dispute. (See *People v. Cromer, supra,* 24 Cal.4th at pp. 900-901 [noting that most often facts are not in dispute and review is independent based on undisputed facts].) At the hearing, the prosecution put its investigator, Lazaro Chong, on the stand. He testified that he contacted Zavala by telephone. Zavala was living in Mexico. He stated he would be willing to testify if he could get a passport and visa to enter the United States legally. He needed money to travel to Mexico City to apply for a passport and visa. He also needed money to make the trip to California.

A second prosecutorial investigator, Shawn Loehr, contacted the Immigration and Naturalization Service, the Mexican Consulate in San Francisco, and the American Consulate in Mexico. Through these contacts it was learned Zavala must appear personally at an American Consulate in Mexico to apply for a visa. Zavala indicated he needed about $100 to make that trip. The prosecution decided not to assist Zavala to make the trip and apparently did nothing more to secure his attendance at the trial.

At the end of the hearing, the trial court stated: "The court finds that [Zavala], . . . by the overwhelming weight of the evidence is a citizen of a

foreign country." While the trial court did not explicitly rule at that point that the preliminary hearing testimony could be used because Zavala was a citizen of a foreign country currently residing in that country, that was the implication.

■■■ The defendants assert the trial court erred by finding Zavala unavailable as a witness. They assert, to comply with the requirements of the confrontation clause, it was necessary for the prosecution to establish it had exercised due diligence in securing Zavala's attendance at trial as a prerequisite to using the former testimony.[1]

Zavala was unavailable pursuant to Evidence Code section 240, subdivision (a)(4) and, therefore, his preliminary hearing testimony was admissible at trial pursuant to Evidence Code section 1291, subdivision (a)(2). Section 240 gives several circumstances in which a hearsay declarant is " 'unavailable as a witness.' " Included are when the declarant is "[a]bsent from the hearing and the court is unable to compel his or her attendance by its process" (subd. (a)(4)) or "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process" (subd. (a)(5)).[2] Applying the language of the statute, the party seeking to use the former testimony need not show reasonable diligence in procuring attendance if the court does not have power to compel the attendance of the witness.

Evidence Code section 1291 allows the use of former testimony if the witness is unavailable and the party against whom the former testimony is

[1]The defendants did not specifically argue in the trial court that, even though the witness was a foreign citizen residing in a foreign country, the prosecution had to make a good faith effort to obtain his attendance at trial. We conclude this failure was not a waiver of the issue. The trial court, relying on cases by which it was bound (see *People v. Denson* (1986) 178 Cal.App.3d 788, 790 [224 Cal.Rptr. 63]; *People v. Ware* (1978) 78 Cal.App.3d 822 [144 Cal.Rptr. 354]), determined it was unnecessary to make a showing of good faith effort. Accordingly, argument to the contrary would have been futile. (See *People v. Whitt* (1990) 51 Cal.3d 620, 655 [274 Cal.Rptr. 252, 798 P.2d 849] [failure to make argument is not a waiver when it would have been futile].)

[2]Evidence Code section 240, subdivision (a) provides:

"Except as otherwise provided in subdivision (b), 'unavailable as a witness' means that the declarant is any of the following:

"(1) Exempted or precluded on the ground of privilege from testifying concerning the matter to which his or her statement is relevant.

"(2) Disqualified from testifying to the matter.

"(3) Dead or unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity.

"(4) Absent from the hearing and the court is unable to compel his or her attendance by its process.

"(5) Absent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process."

offered was a party to the proceeding in which the former testimony was given and had the right to confront and cross-examine the witness.[3] There is no dispute in this case that the testimony the prosecution sought to use was presented in the defendants' preliminary hearing, where the defendants had the opportunity to, and did in fact, cross-examine him.

Here, Zavala was absent from the trial and the trial court had no power to compel his appearance in person in Sacramento County. (See *Barber v. Page* (1968) 390 U.S. 719, 723 [88 S.Ct. 1318, 1321, 20 L.Ed.2d 255, 259] [process of trial court of no force outside the jurisdiction].) As noted, Evidence Code sections 240 and 1291 allowed use of Zavala's former testimony in the defendants' trial, which raises the question of whether such use violated the defendants' constitutional rights.

 The confrontation clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." (See also Cal. Const., art. I, § 15.) The United States Supreme Court "has emphasized that the Confrontation Clause reflects a preference for face-to-face confrontation at trial, and that 'a primary interest secured by [the provision] is the right of cross-examination.' [Citation.]" (*Ohio v. Roberts, supra,* 448 U.S. at p. 63 [100 S.Ct. at p. 2537], fn. omitted.) "The Court, however, has recognized that competing interests, if 'closely examined,' [citation] may warrant dispensing with confrontation at trial. [Citation.]" (*Id.* at p. 64 [100 S.Ct. at p. 2538].) "True to the common-law tradition, the process [of defining the requirements of the confrontation clause] has been gradual, building on past decisions, drawing on new experience, and responding to changing conditions." (*Ibid.*)

"[W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." (*Ohio v. Roberts, supra,* 448 U.S. at p. 66 [100 S.Ct. at p 2539].) When, as here, the hearsay statement sought to be used is former testimony, the "indicia of reliability" prong of the confrontation clause analysis is satisfied if there was an adequate opportunity for the defendant to cross-examine the witness and counsel took advantage of that opportunity. (*Id.* at p. 73 and fn. 12 [100 S.Ct.

---

[3]Evidence Code section 1291, subdivision (a) provides, in part:

"Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶]

"(2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

at pp. 2542-2543].) Zavala testified at the preliminary hearing and was cross-examined by defense counsel. Accordingly, to determine whether the trial court's admission of the preliminary hearing transcript violated the confrontation clause, we need only determine whether Zavala was unavailable, applying the constitutional standard.

Before 1968, a witness absent from the jurisdiction in which the witness's testimony was sought was deemed unavailable for the purpose of applying the former testimony exception to the hearsay rule because the witness was beyond the reach of the court's process. Under the statutory scheme, the prosecution was not required to show reasonable diligence in securing the attendance of the witness at trial. Use of the former testimony of a witness who later left the state and did not return did not violate the confrontation clause. (*People v. Carswell* (1959) 51 Cal.2d 602, 605 [335 P.2d 99]; *People v. Barker* (1904) 144 Cal. 705, 706-707 [78 P. 266].)

In 1968, however, the United States Supreme Court, citing the confrontation clause, held that, because of increased cooperation between the states to secure the attendance of witnesses from outside the state, "a witness is not 'unavailable' for the purposes of the [former testimony] exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial. . . . The right of confrontation may not be dispensed with so lightly." (*Barber v. Page, supra,* 390 U.S. at pp. 723-725 [88 S.Ct. at p. 1322]; see also *People v. Cromer, supra,* 24 Cal.4th at p. 892 [reasonable diligence standard under state Constitution].)

In *Barber,* the court recognized the state court did not have the power to compel the attendance of a witness incarcerated in federal prison in a different state. Federal statute, however, gave "federal courts the power to issue writs of habeas corpus ad testificandum at the request of state prosecutorial authorities." (390 U.S. at p. 724 [88 S.Ct. at p. 1321], italics omitted.) Furthermore, it was the policy of the federal prisons "to permit federal prisoners to testify in state court criminal proceedings pursuant to writs of habeas corpus ad testificandum issued out of state courts." (*Ibid.,* italics omitted.) The *Barber* court concluded the defendant's right to confrontation had been violated because the prosecution did not make a good faith effort to obtain the attendance of the witness at trial. (*Id.* at p. 725 [88 S.Ct. at p. 1322].)

In 1972, the same issue arose with respect to a witness who was a citizen and resident of Sweden. (*Mancusi v. Stubbs* (1972) 408 U.S. 204 [92 S.Ct. 2308, 33 L.Ed.2d 293].) In *Mancusi,* the petitioner was convicted of a felony

in New York and was sentenced as a repeat offender because he previously suffered a conviction in Tennessee. He petitioned for a writ of habeas corpus in the federal courts, asserting the Tennessee conviction was constitutionally unsound because it was obtained in violation of his right to confrontation. (*Id.* at p. 205 [92 S.Ct. at p. 2309].) The petitioner kidnapped and shot a husband and wife in Tennessee in 1954. The wife died, but the husband survived and testified against the petitioner in his first trial. After the trial, the husband returned to his native Sweden. The petitioner's conviction was reversed and he was retried. The husband's son took the stand and testified concerning his father's permanent residence in Sweden. Over the petitioner's objection, the prosecution was allowed to read to the jury the husband's testimony from the first trial. (*Id.* at pp. 207-209 [92 S.Ct. at pp. 2310-2311].) The Supreme Court found that the use of the Tennessee conviction to sentence the petitioner as a repeat offender in New York did not violate the petitioner's right to confrontation. Distinguishing *Barber v. Page, supra,* 390 U.S. 719, the court stated: "Upon discovering that [the husband] resided in a foreign nation, the State of Tennessee, so far as this record shows, was powerless to compel his attendance at the second trial, either through its own process or through established procedures depending on the voluntary assistance of another government. [Citation.] We therefore hold that the predicate of unavailability was sufficiently stronger here than in *Barber* that a federal habeas court was not warranted in upsetting the determination of the state trial court as to [the husband's] unavailability." (*Mancusi v. Stubbs, supra,* 408 U.S. at pp. 212-213 [92 S.Ct. at p. 2313].)

The *Mancusi* court reasoned: "The Uniform Act to secure the attendance of witnesses from without a State, the availability of federal writs of habeas corpus ad testificandum, and the established practice of the United States Bureau of Prisons to honor state writs of habeas corpus ad testificandum, all supported the Court's conclusion in *Barber* that the State has not met its obligations to make a good-faith effort to obtain the presence of the witness merely by showing that he was beyond the boundaries of the prosecuting State. There have been, however, no corresponding developments in the area of obtaining witnesses between this country and foreign nations." (*Mancusi v. Stubbs, supra,* 408 U.S. at p. 212 [92 S.Ct. at p. 2313], italics omitted.)

While the *Mancusi* court commented the trial court "was powerless to compel [the witness's] attendance" (*Mancusi v. Stubbs, supra,* 408 U.S. at p. 212 [92 S.Ct. at p. 2313]), it made this statement in the context of explaining that there were no procedures or agreements similar to the cooperation between states when the witness resided in a foreign nation. As will be seen, that no longer is true with the advent of mutual legal assistance treaties.

After the United States Supreme Court decided *Mancusi,* the issue of whether the prosecution had to make a good faith effort to obtain the

attendance of a witness was presented to the Court of Appeal in 1978, in *People v. Ware, supra,* 78 Cal.App.3d 822. In *Ware,* the victim of a sexual assault testified at the defendant's preliminary hearing then went home to Spain. The prosecution made no attempt to have her return to testify at trial, even though the prosecution had her address and telephone number in Spain. The trial court ruled she was unavailable and allowed the preliminary hearing testimony to be presented to the jury. (*Id.* at pp. 827-829.)

The *Ware* court concluded the defendant's right of confrontation was not violated by the presentation of the victim's preliminary hearing testimony at trial. Noting the cases from the United States Supreme Court on this issue, the court stated: "The due diligence doctrine enunciated in *Barber* is predicated on the presence of alternatives, such as agreements between the states to secure the presence of the absent witness at the trial [citation]." (*People v. Ware, supra,* 78 Cal.App.3d at p. 831.) The court also quoted the language from *Mancusi* where it observed that " '[t]here have been . . . no corresponding developments in the area of obtaining witnesses between this country and foreign nations' " (*id.* at p. 833, quoting *Mancusi v. Stubbs, supra,* 408 U.S. at p. 212 [92 S.Ct. at p. 2313]) and therefore concluded that "a witness outside of the country can be considered per se unavailable without violating the Sixth Amendment" and rejected the defendant's confrontation clause contention (*People v. Ware, supra,* at p. 833).

In a similar case, another district of the Court of Appeal, in 1986, also citing *Mancusi,* opined it is unnecessary for the prosecution to establish it made a good faith effort to obtain the attendance of a witness who is a foreign citizen residing outside this country. (*People v. Denson, supra,* 178 Cal.App.3d at pp. 791-792.) In *Denson,* the victim of the defendant's sexual attack testified at the defendant's preliminary hearing. She then returned to her home in England. The prosecutor contacted the witness and offered to pay her expenses to return for trial. When the witness stated that she would not come unless her husband could come too, the prosecutor declined to pay his expenses. The witness therefore refused to come. (*Id.* at pp. 790-791.)

The *Denson* court began its opinion stating: "In this case, we hold that a witness who is a foreign citizen outside of this country at the time of trial is 'unavailable' for purposes of admitting his or her prior testimony. Thus, the prosecution's unsuccessful efforts to obtain the witness's presence are irrelevant to a determination of whether that prior testimony is admissible at trial." (*People v. Denson, supra,* 178 Cal.App.3d at p. 790.) After quoting the holding from *Mancusi,* the court concluded: "Thus, a foreign citizen outside of the country can be considered per se unavailable without violating the Sixth Amendment." (*Id.* at p. 792.)

In *Denson,* however, the defendant conceded that a foreign citizen outside of this country is unavailable. The issue to be decided was solely whether the prosecution, after having undertaken efforts to secure the attendance of the absent witness, had to show it exercised reasonable diligence in so doing. (*People v. Denson, supra,* 178 Cal.App.3d at p. 791.) The court held it was irrelevant whether the prosecution refused to pay travel expenses for the husband of the witness because there was no requirement that the prosecution show a good faith effort to obtain the attendance of the witness. (*Id.* at p. 793.)

 In 1980, the United States Supreme Court, in *Ohio v. Roberts, supra,* 448 U.S. 56, reiterated the test of unavailability for the purpose of confrontation clause analysis.[4] The court stated: "The basic litmus of Sixth Amendment unavailability is established: '[A] witness is not "unavailable" for purposes of the . . . exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial.' [Citations.]" (*Ohio v. Roberts, supra,* 448 U.S. at p. 74 [100 S.Ct. at p. 2543], italics added by *Roberts.*)

The high court continued: "Although it might be said that the Court's prior cases provide no further refinement of this statement of the rule, certain general propositions safely emerge. The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), 'good faith' demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. 'The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness.' [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate." (*Ohio v. Roberts, supra,* 448 U.S. at pp. 74-75 [100 S.Ct. at p. 2543], italics in original.)

 As noted in *Ohio v. Roberts, supra,* 448 U.S. at page 64 [100 S.Ct. at page 2538], conditions affecting the reasonable steps the prosecution must take to secure the attendance of a witness before the trial court may find the witness unavailable change over time. Relevant to the determination of reasonableness in this case is a treaty between the United States and Mexico concerning cooperation in criminal matters.

Beginning in the 1970's, the United States entered into treaties with other nations to provide mutual cooperation in legal matters. (Zagaris & Resnick,

---

[4]In *Roberts,* the whereabouts of the absent witness was unknown. She was believed to be outside the state. (*Ohio v. Roberts, supra,* 448 U.S. at p. 60 [100 S.Ct. at pp. 2535-2536].)

*The Mexico-U.S. Mutual Legal Assistance in Criminal Matters Treaty: Another Step Toward the Harmonization of International Law Enforcement* (1997) 14 Ariz. J. Internat. & Comp. Law 1, 5 (hereafter Zagaris & Resnick).) In December 1987, the United States and Mexico negotiated and signed the Treaty on Cooperation Between the United States of America and the United Mexican States for Mutual Legal Assistance. (Mexico-United States: Mutual Legal Assistance Cooperation Treaty, Dec. 9, 1987, Sen. Treaty Doc. No. 100-13, eff. May 3, 1991, 27 I.L.M. 443 (the Treaty).) After ratification by the Mexican Congress and the United States Senate, it became effective on May 3, 1991. (See Zagaris & Resnick, *supra,* 14 Ariz. J. Internat. & Comp. Law at pp. 19-25.) Generally, the Treaty provides for mutual legal assistance in criminal matters. (Treaty, art. 1, par. 1; 27 I.L.M. at p. 447.)

Several provisions of the Treaty relate to obtaining the testimony of a witness. Article 7 allows a prosecutor in the United States to request that a witness in Mexico be compelled by Mexican authorities to appear and testify, but only in Mexico.[5] Article 8 provides for the transportation to the United States of a person in custody in Mexico to testify if the person consents and Mexico has no reasonable basis to deny the request.[6] And article 9 allows the prosecution to request the assistance of Mexican authorities to invite a person in Mexico to come to California and testify and to inform the person concerning the extent to which expenses will be paid.[7]

The holdings of both *Denson* and *Ware,* decided in 1986 and 1978, respectively, that "a [witness] outside of the country can be considered per se unavailable without violating the Sixth Amendment" (*People v. Denson, supra,* 178 Cal.App.3d at p. 792; *People v. Ware, supra,* 78 Cal.App.3d at p. 833) must be viewed in their legal contexts when rendered. As noted in both opinions and in *Mancusi,* there had been no developments in cooperation between nations in the area of obtaining witnesses. (*Mancusi v. Stubbs,*

---

[5]"A person in the requested State whose testimony is requested shall be compelled by subpoena, if necessary, by the competent authority of the requested Party to appear and testify or produce documents, records, and objects in the requested State to the same extent as in criminal investigations or proceedings in that State." (Treaty, art. 7, par. 1; 27 I.L.M. at p. 449.)

[6]"A person in custody in the requested State who is needed as a witness or for purposes of identification in the requesting State shall be transported to that State if such person consents and if the Coordinating Authority of the requested Party has no reasonable basis to deny the request." (Treaty, art. 8, par. 1; 27 I.L.M. at p. 449.)

[7]"When the appearance of a person who is in the requested State is needed in the requesting State, the Coordinating Authority of the requested Party shall invite the person to appear before the appropriate authority of the other Party, and shall indicate the extent to which the expenses will be paid. The Coordinating Authority of the requested Party shall communicate the response of the person promptly to that of the requesting Party." (Treaty, art. 9; 27 I.L.M. at p. 449.)

*supra,* 408 U.S. at p. 212 [92 S.Ct. at pp. 2312-2313]; *People v. Denson, supra,* 178 Cal.App.3d at p. 792; *People v. Ware, supra,* 78 Cal.App.3d at p. 833.) The Treaty, which became effective in 1991, was signed before Zavala returned to Mexico and his former testimony was used at trial.

Through the Treaty, the United States and Mexico have agreed to "cooperate with each other by taking all appropriate measures that they have legal authority to take, in order to provide mutual legal assistance in criminal matters . . . . Such assistance shall deal with the prevention, investigation and *prosecution* of crimes . . . ." (Treaty, art. 1, par. 1, 27 I.L.M. at p. 447, italics added.) As noted above, the treaty specifically provides for mutual assistance in obtaining witnesses for trial. (Treaty, arts. 7-9; 27 I.L.M. at p. 449.)

The cooperation between jurisdictions engendered in the Treaty is precisely the type of future development the United States Supreme Court envisioned when, looking back on the development of confrontation clause jurisprudence, it noted that the jurisprudence necessarily changes along with changing conditions. (*Ohio v. Roberts, supra,* 448 U.S. at p. 64 [100 S.Ct. at p. 2538].) In *Barber,* in 1968, the high court, relying on then recent changes in cooperation between states to make witnesses available at trials, rejected earlier pronouncements that a witness is unavailable simply because that witness was not present within the jurisdiction of the court. (*Barber v. Page, supra,* 390 U.S. at pp. 723-725 [88 S.Ct. at pp. 1321-1322].) The *Mancusi* court held, in 1972, that the United States had not yet made agreements with foreign countries similar to the interstate agreements found in *Barber.* (*Mancusi v. Stubbs, supra,* 408 U.S. at p. 212 [92 S.Ct. at pp. 2312-2313].) In *Roberts,* in 1980, the court declared that the "basic litmus of Sixth Amendment unavailability" is whether the prosecution made a good faith effort to obtain the witness's presence (*Ohio v. Roberts, supra,* 448 U.S. at p. 74 [100 S.Ct. at p. 2543]), thus implicitly rejecting the notion that a witness could be found unavailable without considering any change in the conditions that might allow the prosecutor to secure the attendance of the witness at trial. The *Roberts* court warned that "if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation." (*Ibid.,* italics in original.)

The Attorney General suggests the prosecution did not have a duty to make a good faith effort to obtain Zavala's presence at the trial simply because the court could not compel his presence under the Treaty. To the contrary, the distinguished precedents we have recognized here are not properly read as making the court's power to compel attendance the sine qua non of the requirement to make a good faith effort to obtain the attendance

of a witness. Instead, power to compel is merely one factor to consider in determining whether such effort would be futile and therefore need not be undertaken.

*Barber* held that a good faith effort must be undertaken even though the court itself does not have the power to compel the attendance of the witness. There, as noted above, the witness whose testimony was sought in a state trial court was incarcerated in a federal prison in a different state. In holding that the prosecution was required to make a good faith effort to obtain the attendance of the witness, the court noted that the ability to obtain such attendance depended on the discretionary cooperation of federal authorities. It concluded, however, that " 'the possibility of a refusal is not the equivalent of asking and receiving a rebuff.' " (*Barber v. Page, supra,* 390 U.S. at p. 724 [88 S.Ct. at p. 1322], quoting *Barber v. Page* (10th Cir. 1966) 381 F.2d 479, 481.)

While the *Mancusi* court held, in 1972, that the state court there was "powerless to compel [the witness's] attendance at the . . . trial, either through its own process or through established procedures depending on the voluntary assistance of another government," it immediately went on to "hold that the predicate of unavailability was *sufficiently stronger* here than in *Barber*" to allow use of the former testimony. (*Mancusi v. Stubbs, supra,* 408 U.S. at pp. 212-213 [92 S.Ct. at p. 2313], italics added.) Here, on the other hand, the predicate of unavailability was not sufficiently stronger than in *Barber* to allow use of the former testimony. The advent of the Treaty, providing for cooperation between the prosecution and Mexican authorities to obtain Zavala's attendance, together with Zavala's apparent willingness to attend if given financial assistance, presents an international scenario under which it is likely the prosecution would have succeeded in obtaining Zavala's attendance, had it tried.

Any exception to the face-to-face confrontation requirement arises because of necessity (*Barber v. Page, supra,* 390 U.S. at p. 722 [88 S.Ct. at pp. 1320-1321]), not for the convenience of the prosecution. If a reasonable effort could have resulted in the witness's attendance at trial, then the prosecution must make such an effort or forgo use of the witness's testimony because the use of the former testimony is not shown to be necessary. This is subject, of course, to the Supreme Court's holding that the prosecution need not undertake a futile act when there is no possibility the prosecution's efforts will secure the attendance of the witness. (See *Ohio v. Roberts, supra,* 448 U.S. at p. 74 [100 S.Ct. at p. 2543].)

The circumstances presented to the prosecution, including finding Zavala, receiving from him his assurance he wanted to cooperate, and determining

that he needed funds to comply, left the prosecution with several options. There was a possibility, not remote, even perhaps a likelihood, that Zavala would attend if the prosecution assisted him. (See *Ohio v. Roberts, supra,* 448 U.S. at p. 74 [100 S.Ct. at p. 2543] [attempt to obtain attendance necessary if "possibility, albeit remote, that affirmative measures might produce . . . their effectuation"].)

The prosecution could have assisted Zavala without reference or resort to the Treaty. The investigator had already determined that Zavala needed to go to Mexico City to apply for a visa, which would allow him to enter the United States lawfully and testify. To go to Mexico City, he would need $100, a reasonable sum. The prosecution, which has the burden of establishing unavailability (*Ohio v. Roberts, supra,* 448 U.S. at pp. 74-75 [100 S.Ct. at pp. 2543-2544]), has neither alleged nor proven that these efforts would have been futile.

The Attorney General argues "the prosecution had no duty to make a good faith effort to secure his attendance by providing funding. None of the cases discussing this issue places that kind of obligation on the prosecutor. It is impossible for this Court to make the assumption that witness Zavala would be willing to attend if only he were given money by the prosecutor. An equally reasonable interpretation of witness Zavala's request was to extract payment from the prosecution for something that he had absolutely no intention of doing." We note the Uniform Act to Secure the Attendance of Witnesses from without the State in Criminal Cases (Pen. Code, § 1334 et seq.), referenced by the Supreme Court in *Barber,* requires the requesting state to pay travel expenses and witness fees. The *Barber* court noted, apparently with approval: "The State seeking his appearance must pay the witness a specified sum as a travel allowance and compensation for his time." (*Barber v. Page, supra,* 390 U.S. at p. 724, fn. 4 [88 S.Ct. at p. 1321].) Furthermore, the prosecution bore the burden of establishing that it would be unreasonable to expend $100 in an attempt to get Zavala to Mexico City to obtain a visa. On independent review, we have no problem concluding it failed to sustain that burden. Thus, the Attorney General's protest that the prosecution should not be required to expend funds is unconvincing.

The Treaty also gave the prosecution means by which it may have obtained Zavala's testimony at trial. The cooperation of Mexican authorities could have been invoked under article 9 to facilitate Zavala's attendance, both by inviting him and by communicating to him the extent to which his expenses would be paid. While this article does not provide that the Mexican authorities will compel the attendance of the witness, it allows cooperation. Indeed, if the prosecution feared Zavala would abscond with the money, it

could have enlisted the aid of Mexican authorities to ensure the proper use of the funds. (See Treaty, art. 1, par. 4(i), 27 I.L.M. at p. 448 [providing for "other forms of assistance mutually agreed by the Parties, in conformity with the object and purpose of this Treaty"].)

Under article 7 of the Treaty, the prosecution also could have enlisted the aid of Mexican authorities to compel Zavala to appear in Mexico to testify during trial. By the use of teleconferencing, the jury could have participated contemporaneously with live direct and cross-examination. While not actual face-to-face confrontation, this teleconferencing may be the next best thing under circumstances in which it is impossible or unreasonable to require the prosecution to obtain the witness's attendance. (See *Maryland v. Craig* (1990) 497 U.S. 836, 857 [110 S.Ct. 3157, 3169-3170, 111 L.Ed.2d 666, 686] [holding that testimony of child abuse victim by closed circuit television did not violate confrontation clause].)

We need not, and do not, hold that live teleconferenced testimony from a remote location is necessary to meet the demands of the confrontation clause in cases in which the witness refuses to attend trial and cannot be compelled. We also need not and do not hold that such remote testimony would be constitutionally acceptable in the place of face-to-face confrontation. It is sufficient for our present purposes to point out, however, that the prosecution had several reasonable alternatives it could have pursued to obtain Zavala's live testimony at trial. Instead of making a good faith effort to obtain any category of contemporary, live testimony, the prosecution threw up its hands and asserted Zavala was unavailable simply because he was a foreign citizen residing outside of the United States. The confrontation clause, which allows for some exceptions to the face-to-face confrontation requirement, calls for more. In the context of the opinions of the United States Supreme Court, from *Barber* through *Roberts,* the alternatives for obtaining constitutionally appropriate testimony have expanded and, therefore, the situations in which the confrontation requirement can be avoided have contracted. Circumstances have changed, so too must the prosecution.

As noted above, the trial court found Zavala unavailable simply because he was in Mexico and was a Mexican citizen. While this test may have properly determined availability under Evidence Code section 240, the test violates the confrontation clause under the circumstances of this case. Zavala was statutorily unavailable because the trial court could not utilize its own process to compel Zavala's attendance at the trial. The Supreme Court has made clear, however, that to satisfy the confrontation clause, the prosecution must make a reasonable, good faith effort to obtain the witness's presence at the trial. (See *Ohio v. Roberts, supra,* 448 U.S. at p. 74 [100 S.Ct. at p.

2543].) Consideration of the options available to the prosecution and the extent to which the prosecution attempted to use these alternatives to obtain Zavala's presence establishes that the prosecution did not make a reasonable, good-faith effort. (*Id.* at pp. 74-75 [100 S.Ct. at pp. 2543-2544].) It did not exercise due diligence. (See *People v. Cromer, supra,* 24 Cal.4th at p. 897.) Therefore, use of Zavala's former testimony violated the defendants' right to confrontation.

■ Having found error, we must determine whether the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710-711, 24 A.L.R.3d 1065]; *Lilly v. Virginia* (1999) 527 U.S. 116, 139-140 [119 S.Ct. 1887, 1901-1902, 144 L.Ed.2d 117, 136] [applying *Chapman* beyond a reasonable doubt standard to violations of the confrontation clause].) We conclude the error was not harmless beyond a reasonable doubt.

Other than the defendants, there were only two eyewitnesses to the actual shooting: Zavala and Camacho-Trejo. The testimony of Camacho-Trejo did not inspire belief in his credibility. He testified under a grant of immunity. At various points in the investigation and judicial proceedings, he gave four incompatible accounts of his perception of the shooting. He claimed, at various times, that he was not present when the shooting occurred, that Joaquin had a gun, that Joaquin had a stick, and, finally, that Joaquin had nothing in his hands. At trial, he denied that one of the bags Zavala gave to him to dispose of contained a gun, but he was impeached with his preliminary hearing testimony in which he stated Zavala gave him a gun to hide or throw away. In sum, we are not confident the jury would have credited the testimony of Camacho-Trejo establishing the attempted robbery or the circumstances of the shooting without corroboration from Zavala's former testimony. It appears the prosecution similarly lacked confidence, or it would not have used Zavala's former testimony. If there was no attempted robbery, then there was no basis for a murder conviction pursuant to the felony-murder rule.

Additionally, Carlisle testified he and Sandoval went to the apartment to trade the shotgun for drugs. Joaquin came out of the bedroom with a gun pointed at Carlisle and, under the stress of the moment, the shotgun Carlisle was told to show to the men discharged as he was unwrapping the towel. If the trial testimony of Camacho-Trejo is to be believed, he could not see whether Joaquin had a gun or whether any such gun was pointed at Carlisle because there was a wall between Camacho-Trejo and Joaquin. Thus, Zavala was the most critical witness concerning whether Joaquin had a gun and, if he did, whether he pointed it at Carlisle. While Zavala testified at the

preliminary hearing that, after Joaquin was shot, Zavala grabbed a gun that was under a bed about a half-meter from Joaquin, he was not questioned concerning whether Joaquin held the gun when he was shot.

"The right to confrontation is basically a trial right. It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness. A preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial." (*Barber v. Page, supra,* 390 U.S. at p. 725 [88 S.Ct. at p. 1322].)

Zavala testified at the preliminary hearing that Sandoval pulled out a gun and told him to give him everything he had. This crucial testimony concerning attempted robbery was read to the jury. There was no opportunity for the jury to observe Zavala and conclude for itself, based on that observation, whether Zavala was telling the truth. Under these circumstances, including the credibility problems of both Camacho-Trejo and Zavala and the fact that without their testimony it is doubtful the prosecution could have obtained guilty verdicts from the jury, the error in admitting Zavala's former testimony was not harmless beyond a reasonable doubt.[8]

## DISPOSITION

The judgment is reversed as to both defendants and remanded to the trial court for further proceedings.

Sims, Acting P. J., and Raye, J., concurred.

Respondent's petition for review by the Supreme Court was denied July 11, 2001. Baxter, J., was of the opinion that the petition should be granted.

---

[8]Given our conclusion of prejudicial error, we need not consider the defendants' remaining contentions.