Filed 6/13/14  P. v. Rivera CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ESTEBAN RIVERA,<br><br>    Defendant and Appellant. | B245091<br><br>(Los Angeles County<br>Super. Ct. No. VA121859) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael A. Cowell, Judge.  Affirmed.

Laura G. Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews, David E. Madeo and Timothy M. Weiner, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Esteban Rivera of attempted premeditated murder (Pen. Code, § 664/187, subd. (a)),[1] second degree robbery (§ 211) and possession of a firearm by a felon (§ 12021, subd. (a)(1)). The jury found true that Rivera personally used and discharged a firearm in the commission of the crimes (§ 12022.53, subds. (b), (c), (d)), and that he personally inflicted great bodily injury (§ 12022.7, subd. (a)) in the commission of the attempted murder and robbery. The trial court sentenced Rivera to an aggregate term in state prison of life plus 25 years. We affirm.

**FACTS**

*The Shooting and Criminal Investigation*

Fernando Vera worked as an armed security guard at the Kitty Kat bar in Huntington Park. He carried a 40-caliber firearm in his belt holster and wore a security uniform. During the hours from late March 4, 2011 into early March 5, 2011, Vera checked identification of patrons entering the bar.

At about 12:20 a.m., on March 5, 2011, Rivera approached Vera and asked him how much a beer cost. Rivera was wearing a black jacket with the hood over his head, but the area where Vera was checking identification was well lit, and Vera saw Rivera's face for eight to ten seconds. When Vera said he did not know how much a beer cost, Rivera walked back outside. Vera saw Rivera light a cigarette while with another person who was shorter than Rivera. Minutes later, the person with Rivera entered the bar and bought a drink.

Shortly thereafter, Rivera walked up to the bar's entrance again. He immediately put a revolver to Vera's temple, and said, "Give me your gun." Vera recognized Rivera as the same person who had just moments before asked about the price of beer. When Vera moved slightly, Rivera shot him in the face. Vera fell to the ground, and Rivera grabbed for Vera's firearm. Vera wrestled Rivera momentarily, but then could no longer move. Vera saw someone pulling on Rivera's jacket. Rivera took Vera's gun and ran away. At trial, Vera testified that, "from the moment [Rivera] asked . . . about the price

---

[1]     All section references are to the Penal Code except as otherwise noted.

2

of the beer, I never forgot his face." Further, Vera testified he was "sure" that it was Rivera who had shot him.

Vera suffered serious injuries from the gunshot. He was hospitalized for over 25 days. At the time of trial, many of his teeth and half of his tongue were still missing, and he continued to have problems breathing. The bullet from the Rivera's gun remained lodged near Vera's spine.

George Brenes lived in an apartment building on West 54th Street and rented a room to Vargas. Brenes knew that Rivera and Manuel Vargas were friends. Brenes saw Rivera at Vargas' apartment a "couple of times." On the afternoon on March 24, 2011, Brenes saw Rivera and Vargas talking in an area behind the apartment building. Rivera lifted his shirt, and Brenes saw a black handgun near Rivera's waist.

That same day, at about 8:20 p.m., Los Angeles Police Department (LAPD) Officer Marlene Lopez and her partner were on patrol near 46th Street and Menlo Street when they observed a possible hand transaction between Rivera, who was on a bike, and Vargas, who was next to a car. The officers detained and searched both men, but did not find anything.

At 9:15 p.m. that evening, LAPD Officer Steven Seiker and his partner responded to a child abuse report at an apartment on West 54th Street in Los Angeles. Vargas, two women, and a baby were inside the apartment. The officers told everyone to wait outside while they searched the premises. During a search of the bedroom, Officer Seiker discovered a loaded handgun in a closet, wrapped inside a pair of underwear. After securing the gun, the officers went back outside to find Vargas was gone. The officers found him hiding in a trash bin behind the apartment complex. The gun recovered in Vargas' bedroom was later determined to be the gun taken from Vera during the incident at the Kitty Kat bar on March 5, 2011.

Huntington Park Police Department Detective Gabriel Alpizar interviewed Vargas after receiving a telephone call regarding the gun recovered from Vargas' bedroom. The interview was tape recorded. Vargas said he followed Rivera into the Kitty Kat bar on the night of the shooting. Vargas said he knew that Rivera shot the security guard.

3

According to Vargas, Rivera pointed a gun at the security guard "very fast" and "everybody" saw him shoot, "not just [Vargas]." Vargas said that Rivera gave him the gun that was found at his apartment, and Vargas hid it.[2]

However, in February 2012, Vargas testified differently at Rivera's preliminary hearing. There, he said he was at the Kitty Kat bar with Rivera on the night of the shooting, but claimed he did not see Rivera with a gun that night. It was dark, he said, and he did not see anything. At some point, he heard a gunshot and saw a flash of light and ran. Vargas did not testify at trial. His preliminary hearing testimony was read to the jury.

LAPD Officer Joel Morales testified he showed Vera a six-pack array of photographs prepared by another officer on March 31, 2011. Vera identified Rivera's photograph as the shooter. Officer Morales said Vera initially looked at the six-pack "for a few seconds" and said he could not identify anybody. After Officer Morales told Vera to "take his time," Vera looked at the six-pack for "a few more seconds," then stated that Rivera's photograph "looked like the person who shot him." At trial, Vera stated that he had been "sure" of his identification of Rivera in the photo array.

Rivera's trial counsel called LAPD Officer Joel Morales to testify as a defense witness. Officer Morales testified he interviewed Vargas in the "holding tank" at the police station. Vargas stated that he had found the gun in a dumpster about two weeks earlier.

On October 30, 2012, the jury returned verdicts finding Rivera guilty of attempted premeditated murder, robbery and possession of a firearm by a felon, with the ancillary firearm and great bodily injury findings noted above. The trial court sentenced Rivera to a term of life on his attempted premeditated murder conviction, plus 25 years to life for the firearm discharged enhancement pursuant to section 12022.53, subdivision (d). The court imposed a concurrent term of five years for the robbery conviction, plus a

---

[2] There was no defense objection during Detective Alpizar's testimony concerning Vargas' substantive statements about Rivera's involvement in the Kitty Kat bar shooting and disposition of the gun.

4

concurrent term of 25 years to life for the firearm enhancement pursuant to section 12022.53, subdivision (d). The court also imposed a concurrent term of three years for the firearm possession conviction.

Rivera filed a timely notice of appeal.

## DISCUSSION

Rivera contends the trial court erred in finding that witness Manual Vargas was unavailable for trial, and allowing Vargas' preliminary hearing testimony to be read to the jury. He argues the error violated his constitutional right to confront a witness under the Sixth Amendment to the United States Constitution and under article 1, section 5, of the California Constitution. Rivera argues the error requires reversal of his convictions. We disagree.

### *Preliminary Facts*

As noted above, Vargas testified at Rivera's preliminary hearing in February 2012. At that time, the prosecutor advised the court that he secured Vargas' appearance from the custody of Immigration Customs Enforcement (ICE), which had agreed to release Vargas to the Los Angeles County Sheriff's Department to allow him to testify at the preliminary hearing. The prosecutor advised the court that ICE had informed him that there was still an immigration hold on Vargas. At the conclusion of the preliminary hearing, the trial court ordered Vargas returned to ICE's custody, noting that Vargas was "going through deportation proceedings."

Before trial, the People filed a written motion to allow the prosecution to read Vargas' testimony from Rivera's preliminary hearing because he was unavailable for trial. The motion included a declaration from Vargas' brother, who apparently lived locally, stating that Vargas had been deported to Mexico, and that Vargas had not told his brother the address where Vargas was living. Vargas' brother stated that he had talked to Vargas on the telephone on April 18, 2012, and that Vargas had stated that he would "not testify." The motion also included a declaration from a Homeland Security official who stated that Vargas had been voluntarily deported to Mexico on March 1, 2012.

5

A declaration from Detective Gabriel Alpizar explained the efforts he made through Vargas' brother to get Vargas to willingly agree to testify.

At a series of pre-trial hearings on the People's motion, the defense objected that the United States and Mexico had a treaty to secure a witness's appearance in a criminal case, and that the prosecution had not made a sufficient showing that it had attempted to comply with its procedures. In response, the prosecutor stated that the investigating detective had been in contact with Vargas' brother, and that the detective had "invited [Vargas] to come here and testify [but Vargas had] declined to do so." The prosecutor stated: "We do not know where [Vargas] is in Mexico."

At that point, the trial court noted that *People v. Sandoval* (2001) 87 Cal.App.4th 1425 (*Sandoval*) ruled that the prosecution is required to pursue "cooperative methods" outlined by the treaty between the United States and Mexico to secure a witness's appearance at trial.

After listening to arguments, the trial court ruled that Article Eight of the treaty did not apply because there was no evidence that Vargas was in custody in Mexico, and that invoking Article Seven of the treaty was impractical because Vargas would have to give testimony in Mexico. The court denied a defense request for a further hearing, and granted the prosecution's motion to allow Vargas' preliminary hearing testimony to be used at trial. The court based its ruling on its finding that Vargas had been deported, and that the prosecution had invited him back, but that it was "not necessary" and "not mandated" and that it would be "burdensome" to further pursue the procedures outlined in the United States and Mexico treaty.

During trial, the court explained that it based its unavailable ruling on *People v. Herrera* (2010) 49 Cal.4th 613 (*Herrera*), which upheld a trial court's finding of due diligence based on the deportation of a witness to El Salvador. Further, the court observed that Vargas' preliminary hearing testimony was not "adversarial to the defense," that his testimony had value to the prosecution only "as a platform" to allow the prosecution to introduce Vargas' statements to the police as "prior inconsistent statements," and that Vargas "had no intent to cooperate" with the prosecution as he had

6

not agreed to return to testify. The court found it would be an exercise in futility for the prosecution to make further attempts under the United States and Mexico treaty to secure Vargas' appearance at trial.

Vargas' preliminary hearing testimony was read to the jury on the second day of trial, the day after Vera testified and identified Rivera as the shooter, and the day before Detective Alpizar testified about Vargas' pre-trial statement implicating Rivera. As noted above, in his preliminary hearing testimony Vargas denied seeing Rivera as the shooter.

### Relevant Law

The Sixth Amendment's Confrontation Clause, applicable in state prosecutions by the 14th Amendment of the United States Constitution, and California's constitutional confrontation clause, guarantee a criminal defendant the right to confront, i.e., to cross-examine, the prosecution's witnesses. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 295; *Herrera, supra,* 49 Cal.4th at pp. 620-621.) The constitutional right to confront the prosecution's witnesses does not impose an absolute requirement that a witness testify at trial against a defendant; an exception to confrontation at trial is allowed when a witness is unavailable at the time of trial, and has given testimony at previous judicial proceedings against the same defendant and was subject to cross-examination. (*Herrera, supra,* 49 Cal.4th at p. 621.) Accordingly, the preliminary hearing testimony of an unavailable witness may be admitted at trial without violating the defendant's constitutional right of confrontation. (*Ibid.*)

Evidence Code section 240 parallels the constitutional guarantee. It provides that a witness is unavailable when he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) "The constitutional and statutory requirements are 'in harmony.'" (*People v. Smith* (2003) 30 Cal.4th 581, 609.) Accordingly, a witness is considered "unavailable" for purposes of the constitutional right of confrontation when the prosecution has made a good-faith effort to secure his presence at trial. (See, e.g., *Ohio v. Roberts* (1980)

7

448 U.S. 56, 74 (*Ohio*), overruled on other grounds by *Crawford v. Washington* (2004) 541 U.S. 36.)

As the Supreme Court explained in *Ohio, supra*: "The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), 'good faith' demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. 'The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness.' [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate." (*Ohio, supra*, at pp. 74-75.)

With respect to a witness who is out of the jurisdiction, the United States Supreme Court has ruled that they may be found unavailable for purposes of confrontation analysis under certain, specific circumstances. In *Barber v. Page* (1968) 390 U.S. 719 (*Barber*), the United States Supreme Court ruled that a witness was not unavailable for a state court criminal trial in Oklahoma even though he was incarcerated in federal prison in Texas. *Barber* noted that it had been previously assumed that the mere absence of a witness from the jurisdiction meant that the witness was unavailable. (*Id.* at p. 723.) However, in light of the increased cooperation between the states, and between the states and the federal government, it was possible to secure the presence of a witness outside the jurisdiction of the court, by way of a federal writ of habeas corpus ad testificandum or the practice of the United States Bureau of Prisons to honor state writs of habeas corpus ad testificandum. Thus, *Barber* concluded that state authorities should have made efforts to avail themselves of these means of obtaining the incarcerated witness's presence. (*Id.* at pp. 723-724.)

In *Mancusi v. Stubbs* (1972) 408 U.S. 204 (*Mancusi*), the United States Supreme Court upheld a state court's determination that a witness who was residing in a foreign country was unavailable because, unlike the procedures available in *Barber*, there were

8

no means to secure the presence of the witness. (*Id.* at pp. 212-213.) As the court explained: "There have been . . . no corresponding developments in the area of obtaining witnesses between this country and foreign nations. Upon discovering that Holm resided in a foreign nation, the State of Tennessee, so far as this record shows, was powerless to compel his attendance at the second trial, either through its own process or through established procedures depending on the voluntary assistance of another government." (*Mancusi*, *supra*, 408 U.S. at p. 212.)

In *Herrera, supra*, the California Supreme Court explained the standard as follows: "when a criminal trial is at issue, unavailability in the constitutional sense does not invariably turn on the inability of the state court to compel the out-of-state witness's attendance through its own process, but also takes into consideration the existence of agreements or established procedures for securing a witness's presence that depend on the voluntary assistance of another government. [Citation.] Where such options exist, the extent to which the prosecution had the opportunity to utilize them and endeavored to do so is relevant in determining whether the obligations to act in good faith and with due diligence have been met. (*Herrera*, *supra*, 49 Cal.4th at p. 628, fn. omitted.)

*Herrera* recognized that the United States Supreme Court in *Ohio v. Roberts* had stated: "'[I]f there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation.'" (*Herrera, supra*, 49 Cal.4th at p. 625, citing *Ohio v. Roberts*, *supra*, 448 U.S. at p. 74.) But at the same time, *Herrera* concluded that this statement in *Ohio v. Roberts* "did not alter or detract from *Mancusi*'s analysis that when the prosecution discovers the desired witness resides in a foreign nation, and the state is powerless to obtain the witness's attendance, either through its own process or through established procedures, the prosecution need do no more to establish the witness's unavailability." (*Herrera, supra*, 49 Cal.4th at p. 625.)

In *Sandoval, supra,* 87 Cal.App.4th 1425, the Court of Appeal noted that the United States and Mexico have entered a treaty (the "1991 Treaty") providing for cooperation in the prosecution of crimes and pledging mutual assistance in obtaining witness testimony. (*Id*. at p. 1440.) In *Sandoval*, the Court of Appeal held that the

9

prosecution must pursue the cooperative methods outlined in the treaty, and that the failure to do so is a failure to show a good faith effort to bring a witness to court for trial. (*Ibid.*) *Sandoval* described the treaty as follows: Article 7 allows a prosecutor in the United States to request that a witness in Mexico be compelled by Mexican authorities to appear and testify in Mexico. Article 8 allows for the transportation to the United States of a person in custody in Mexico to testify, if the person consents and Mexico has no reasonable basis to deny the request. Finally, Article 9 allows the prosecution to request the assistance of Mexican authorities to invite a person in Mexico to come to California and testify and to inform the person concerning the extent to which expenses will be paid. (*Id.* at p. 1439.)

We apply the following standard on an appeal challenging a trial court's ruling that a witness was unavailable: "We review the trial court's resolution of disputed factual issues under the differential substantial evidence standard . . . , and independently review whether the facts demonstrate prosecutorial good faith and due diligence . . . ." (*Herrera, supra*, 49 Cal.4th at p. 623.) Finally, when it is determined on appeal that a witness's testimony was wrongly admitted in violation of constitutional confrontation protections, the error is subject to a harmless error analysis under the standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Ledesma* (2006) 39 Cal.4th 641, 709.)

*Analysis*

Under the law summarized above, the issue to be addressed on Rivera's current appeal is whether the historical facts, as established and supported by substantial evidence in the record, independently demonstrate witness Vargas was unavailable to testify at Rivera's trial. Underlying this is the more specific issue of whether the prosecution exercised "due diligence" to secure Vargas' appearance at trial. We find the court correctly ruled Vargas was unavailable to testify at trial.

The evidence presented at the hearing to determine whether Vargas was unavailable showed that Vargas had been voluntarily deported to Mexico seven months before Rivera's trial. Vargas' brother stated in a declaration that Vargas told him he would not come back to the United States to testify and that he did not know Vargas'

10

address. The reasonable inferences are that Vargas had not returned to the United States after being deported to Mexico, and was not in custody in Mexico. Next, while no direct evidence was presented on the matter, it cannot be doubted that arranging for Vargas' trial testimony to be taken in Mexico would have been burdensome and likely unworkable, even in the event Vargas could ever be located.

We find the evidence established that Vargas was unavailable for purposes of a Sixth Amendment right to confrontation analysis. We disagree with Rivera that *Herrera* compels the conclusion that the prosecution's efforts to locate Vargas were inadequate as a matter of law. In *Herrera*, a prosecution witness was deported to El Salvador. An investigation by the prosecution uncovered no information that the witness had returned to California. The prosecution contacted law enforcement authorities in El Salvador in an attempt to locate the witness there but he could not be found. In any event, no treaty existed between the United States and El Salvador that would have provided for the witness's extradition or return. (*Herrera*, *supra*, 49 Cal.4th at pp. 628-629.) On this record, the California Supreme Court concluded that the prosecution had fulfilled its obligation of good faith and due diligence to locate the witness and that the admission of the unavailable witness's preliminary hearing testimony was proper. (*Id.* at p. 629.)

Rivera's attempt to distinguish *Herrera* is not persuasive. Rivera correctly observes that the prosecution in *Herrera* attempted to locate the witness in El Salvador through Mexican police officials. In contrast, the prosecution here attempted to find Vargas in Mexico by contacting his brother. We agree with Rivera that *Herrera* supports the proposition that the prosecution's efforts are sufficient where it attempted to locate the witness in a foreign country through the country's official police authorities, but we do not agree with Rivera that *Herrera* stands for the proposition that the prosecution *necessarily* must do so or there cannot be a finding that a witness is unavailable. *Herrera* ruled that, under *Mancusi*, when the prosecution discovers that a witness is in a foreign nation, and the prosecution is "powerless" to obtain the witness's appearance at trial, "either through its own process or through established procedures, *the prosecution need do no more to establish the witness's unavailability*." (*Herrera*, *supra*, 49 Cal.4th at

11

p. 625, emphasis added.) We are satisfied that the prosecution in Rivera's current case was powerless to obtain Vargas' appearance because it did not even know where he was in Mexico.

We are also unpersuaded by Rivera's reliance on *Sandoval*. In *Sandoval*, a witness who testified at the preliminary hearing was subsequently deported to Mexico. The prosecution contacted the witness in Mexico, who indicated that he was willing to return to California with the prosecution's assistance. The prosecution, however, decided not to assist him and the witness did not return. He was found to be unavailable and his preliminary hearing testimony was read at the trial. (*Sandoval*, *supra*, 87 Cal.App.4th at pp. 1432-1433.) The Court of Appeal observed that there was a treaty between the United States and Mexico that specifically provided for mutual assistance in obtaining witnesses for trial. (*Id.* at p. 1440.) Primarily because of this treaty, *Sandoval* found that the prosecution did not make good faith efforts to secure the testimony of the witness. (*Id.* at p. 1444.) It concluded that the witness's preliminary hearing testimony was erroneously admitted since he was not unavailable. (*Ibid.*)

Unlike the witness in *Sandoval*, here, Vargas was not found, and he expressly told his brother that he was unwilling to return to the United States to testify. Thus, even though there exists a treaty between the United States and Mexico, its provisions were unhelpful to the prosecution in Rivera's case.

Rivera further argues that the prosecution did not make good faith efforts to secure Vargas' testimony because it did not make any arrangements to procure and preserve his trial testimony before he was deported. In support of this contention, Rivera relies on *People v. Roldan* (2012) 205 Cal.App.4th 969 (*Roldan*). In *Roldan*, victim Barrera was arrested for a probation violation after the defendant's crime and served five months in jail. When his sentence ended, he remained in county jail on a federal immigration hold until the preliminary hearing nine months later. After the preliminary hearing, he was released to federal authorities who deported him to Mexico. The prosecution knew Barrera was going to be deported when it released him to federal authorities. (*Id.* at p. 976.) The trial court determined that Barrera was an unavailable witness and allowed

12

his preliminary hearing testimony to be admitted at trial. (*Id.* at p. 978.) The Court of Appeal in *Roldan* determined that the prosecution did not undertake reasonable and good faith efforts to protect the defendant's right to confrontation knowing that Barrera was going to be deported. (*Roldan*, *supra*, 205 Cal.App.4th at pp. 980-984.) *Roldan* concluded that the prosecution could have videotaped Barrera's preliminary hearing testimony, sought his detention as a material witness under section 1332, sought to delay his deportation, sought a writ from the federal court, or taken steps prior to his deportation to ensure he would stay in touch with authorities and return for the trial. (*Roldan, supra,* at pp. 980-984.)

In Rivera's current case, the record shows the prosecution understood that witness Vargas was in custody of federal immigration officials and was "going through" deportation proceedings at the time of Rivera's preliminary hearing in February 2012, but there is no evidence to show the prosecution knew when Vargas was to be deported. What the record does show is that the prosecution learned that Vargas had been voluntary deported about a month before trial. Because the evidence does not show the prosecution knew Vargas' deportation was imminent, it cannot be faulted for failing to take steps to protect Rivera's right of confrontation prior to Vargas' deportation.

Finally, assuming the trial court erred in admitting witness Vargas' testimony, we find the error was harmless under the heightened constitutional standard of *Chapman v. California, supra,* 386 U.S. at page 24. Vera was a security guard, and he had an opportunity to see Rivera both before and during the shooting. Vera was "sure" that Rivera was the shooter, and that he never forgot his face from the moment he first saw him. Corroborating Vera's testimony was that of George Brenes, who knew Rivera and Vargas were friends, saw the two at Vargas' apartment a "couple of times," and observed Rivera and Vargas talking in an area behind the apartment building when Rivera lifted his shirt, exposing a black handgun near Rivera's waist. Rivera and Vargas were seen together two times in one day within weeks of the shooting, and, shortly after the second meeting, the gun taken in the attempted murder was found in Vargas' house, wrapped and hidden.

13

Finally, Rivera's counsel called Officer Morales to read Vargas' statement to him that he found the gun in a dumpster.  This made Detective Alpizar's testimony about Vargas' statements implicating Rivera as the shooter and giving the gun to Vargas independently admissible to rebut Vargas' later inconsistent statements that he found the gun in a trash can.  As a result, we are satisfied, beyond a reasonable doubt, that any error was harmless.

## DISPOSITION

The judgment is affirmed.


BIGELOW, P.J.


We concur:



RUBIN, J.



KUSSMAN, J.*

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.