Filed 10/30/14  P. v. Rocha CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059570 |
| v. | (Super.Ct.No. RIF1303076) |
| DANIEL NINO ROCHA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Bernard Schwartz, Judge.

Affirmed with directions.

Rodger P. Curnow, under appointment by the Court of Appeal, for Defendant and

Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General,

Eric A. Swenson, Kristine A. Gutierrez, and Lynne G. McGinnis, Deputy Attorneys

General, for Plaintiff and Respondent.

# I

## INTRODUCTION

Defendant Daniel Nino Rocha appeals from judgment entered following jury convictions for assault with a firearm (Pen. Code, § 245, subd. (a)(2)[1]; count 1), possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2), and participation in a street gang (§ 186.22, subd. (a); count 3)). The jury also found true the enhancements of personally using a firearm and personally inflicting great bodily injury (GBI) as to count 1 (§§ 12022.5, subd. (a), and 12022.7, subd. (a)). As to counts 1 and 2, the jury found true allegations that the crimes were committed for the benefit of, at the direction of, or in association with, a criminal street gang (§ 186.22, subd. (b)). In addition, defendant admitted he served one prior prison term (§ 667.5, subd. (b)) and had one prior serious felony conviction (§ 667.5, subd. (a)) and one prior strike conviction (§§ 667, subds. (a) & (e)(1), and 1170.12, subd. (e)(1)). The trial court sentenced defendant to an aggregate prison term of 38 years and eight months.

Defendant contends the trial court's admission of preliminary hearing testimony by David Jackson and Bernie Davis violated defendant's constitutional rights to confrontation, due process, cross-examination, compulsory process, and a fair trial, and to present a defense. Defendant also contends there was insufficient evidence to support his convictions, and the trial court erred in failing to give a clarifying instruction on the meaning of "in association with any criminal street gang." Defendant further argues

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

there was insufficient evidence to support the gang enhancements, and the sentence on count 3 must be stayed. We conclude there was no prejudicial error, with the exception the sentence on count 3 must be stayed under section 654. In all other regards, we affirm the judgment.

## II

## FACTS

As Jackson was arriving home on October 10, 2012, around 9:45 p.m., he noticed two men on his street, Hillside Drive. The men looked "weird" to him. After parking and entering his home, he heard his dogs barking and noise coming from his backyard gate which adjoins the backyard of his neighbor, David Herrera.[2] Jackson went outside and saw one or two people running from his house, up the street. Jackson went to David's house and told him someone had been in David's backyard and jumped his fence.

Jackson, David, and his cousin Bernie Davis got into Jackson's four-door truck and drove about 300 feet, in the direction Jackson had seen the two men running. Jackson drove up to the two men and stopped. David, Davis, and Jackson got out of the truck and confronted the two men. David had already started wrestling with one of the two men as Davis went around the truck to the other side where they were fighting.

---

[2] To avoid confusion, witnesses David Herrera and Gabriel Herrera, who share the same last name but are not related, will be referred to by their first names. We will also refer Bernie Davis's wife, Jordan Davis, by her first name, and to sisters, Marissa, Selena, and Liana Holmes, by their first names. All others will be referred to by their last names.

While David was fighting with one of the men, the other man shot Jackson in the left hand, both legs, and stomach. Jackson said, "'Help me. Help me. Get me to the hospital. I'm down. . . . I'm going to die. I'm going to die.'" Jackson claimed he did not have a gun when he was shot. His wife's gun was in the glove compartment of his truck.

Davis testified that, after Jackson was shot, Jackson or David told Davis to pick up Jackson's gun on the ground and put it in the truck glove compartment box. Davis did so. Davis and David picked up Jackson, put him in the truck, and drove him to the hospital.

Robert Peters, who lived on Hillside Drive, testified at trial that on October 10, 2012, around 9:45 p.m., he heard about six rapidly fired gunshots. Robert's wife called 911. Robert grabbed his firearm, ran to the front door, opened the door, and saw a gray or black SUV with its headlights on and engine running, in front of his driveway. There were about four individuals running around the car, with the driver and passengers switching seats. Robert yelled from his front door, "What's going on?" After the second time he yelled this, a young man said, "It's not me. They're shooting at us." Robert said, "'Then get out of here,'" and they sped off. Ten or 15 minutes later the police arrived.

Officer Bennett responded to the call. The dispatcher said a black SUV had left the shooting scene on Hillside Drive. Bennett observed a black SUV leaving the area, reported it to dispatch, and followed the SUV to the hospital. Officer Segura provided backup, following Bennett's unit. Upon the SUV's arrival at the hospital, the officers conducted a felony stop. A man got out of the back of the SUV, yelling, "'I've been shot.

4

I've been shot.'" The officers identified the man as Jackson and assisted him in getting medical help.

The officers returned to the Hillside Drive area to determine the location of the crime scene and search for evidence. Bennett contacted Robert and his wife, who told Bennett there had been gunshots in the area of their home and two men had been seen jumping over a retaining wall, and running through the front yard of another residence. Several other witnesses also saw the two men going over the retaining wall. Bennett saw two sets of foot prints in the wet grass by the retaining wall of a nearby home. Law enforcement secured the home on Hillside Drive, with an officer watching the back of the home. A taxi came to pick up Marissa at the home. Bennett approached her as she walked out to the cab. At Bennett's request, Marissa called her mother, Rosanna Saubel, and asked her to come outside. Rosanna came out and told Bennett there were no suspects in her house. Only her two other daughters were there. Rosanna consented to the officers searching her home to confirm the suspects were not there.

Bennett, Officer Feola, and Police Sergeant Hobb entered Rosanna's home with guns drawn. Rosanna's two daughters, Selena and Liana, were in the living room. Feola went to the back of the house and outside, where he chased a suspect in the backyard. He apprehended and arrested the individual, who was identified as Gabriel Herrera. Feola notified Bennett of the arrest by radio as Bennett continued searching the house. Bennett told Selena and Liana that they could be subject to arrest if they did not tell him if anyone else was in the house. Selena pointed to a bedroom and indicated someone was in there. Bennett told Hobb and Feola, who had reentered the house, that someone was possibly in

5

the bedroom. Feola yelled for the individual to come out with his hands up. A short time later, defendant crawled out of the bedroom.

After defendant was arrested, the officers thoroughly searched the house. Selena indicated to Bennett that he should look in the laundry room. Bennett found in the clothes hamper, under some clothes, a semiautomatic .45-caliber handgun. There was a magazine in the gun and one cartridge in the chamber.

Officer Segura spoke to Jackson at the hospital. Jackson told him he saw two men jump over David's fence. Jackson went next door to tell David. David, Davis, and Jackson got into Jackson's SUV to look for the two men. When they found the men, they confronted them about being at Jackson's residence. One of the two men fought with David on someone's front lawn and the other individual shot Jackson. Davis similarly told Segura that, while he was having dinner with David, Jackson came over and said two men were in David's backyard. David, Jackson, and Davis went to look for the two men in Jackson's truck. They found the two men a short distance away. Davis confirmed the man who shot Jackson was not the man who was fighting with David.

Police Detective David Loera conducted separate infield show-ups at the police station. Davis identified defendant and Gabriel as the two perpetrators. Davis identified defendant as the shooter and said, "'I'm pretty sure that's him.'" "'It was dark.'" However, at the preliminary hearing, Davis recanted his identification. He testified he could not see anyone because "[i]t was really dark and it happened so quick." Jackson testified at the preliminary hearing that he was positive defendant was not the shooter and that he could recognize defendant because he went to school with defendant. Jackson

6

described him as a "good guy" and said defendant was not a gang member.[3]

Gabriel testified at trial that on October 10, 2012, after drinking at home, he "blacked out," and then went to Selena's house. He jumped over the gate and knocked on the back door. She invited him into only the laundry room. Gabriel borrowed her phone and went outside to call his mother. When he heard the police arrive, he ran because he was on parole. Defendant was not with him that evening. Defendant and Gabriel are cousins. Gabriel claimed he did not know defendant was in the house. Gabriel pled guilty in the instant case to assault with a deadly weapon (his fists).

Gabriel said that, although he had gang tattoos and was a documented gang member, he was "trying to do better with [his] life." Gabriel admitted he was convicted in 2009 of giving a false identification to police officers and of being an active member of a criminal street gang. He pled guilty to the criminal street gang offense.

**Gang Expert Testimony**

Sergeant Hobb testified as a gang expert for the prosecution. Hobb stated that Eastside Banning Sapos gang (ESBS) is the largest gang in the Banning/Beaumont area. There are three cliques within the gang: the Santos, the Mad Ass Youngsters, and the Pee Wee Locos. The gang's primary activities are auto thefts, drug sales, thefts, burglaries, and possession of guns. Nongang members usually refuse to cooperate with law enforcement when ESBS is involved because of fear of retaliation and intimidation by the gang.

---

[3] Davis and Jackson's preliminary hearing testimony was read to the jury, since they were found to be unavailable at the time of trial.

7

According to Hobb, ESBS committed two predicate crimes. On May 29, 2009, Hobbs stopped a vehicle driving in a neighborhood where there were reports of shootings. Three ESBS members were in the car. Hobb found two loaded firearms in the car.

The second predicate crime was on January 6, 2010, when five ESBS members, including defendant, got out of a car at an intersection and chased the 18-year-old victim and his brother. The brother escaped but the ESBS members severely beat up the victim, who was wearing a leg brace. A passerby intervened and called the police. Defendant was arrested and charged with assault with a deadly weapon and a gang enhancement.

In Hobb's opinion, defendant and Gabriel were active ESBS members. During several police interviews, including in the instant case, defendant admitted membership and said he had a gang moniker. Defendant also had numerous gang tattoos and was seen on his brother's website throwing gang signs. Gabriel also admitted gang membership, beginning in 2007, and claimed to be a member of the Pee Wee Locos ESBS clique. He had a moniker and several gang tattoos. Hobb also knew Rosanne Saubel. He had been in her home and had seen ESBS graffiti on her daughter's bedroom walls and door frame.

Hobb testified he would be suspicious if he saw two ESBS members walking around a neighborhood, jumping over fences, and looking into backyards. He would suspect the men were looking for someone or something to steal. In Hobb's opinion, if defendant fired a gun at a civilian, the crime would benefit ESBS by instilling fear in the community and allowing ESBS to operate with impunity, since witnesses and victims would be afraid to contact law enforcement. Defendant's possession of a gun also

8

benefited ESBS, because it was used to protect defendant from other gang members and law enforcement. Gun possession allowed defendant to harm others and commit crimes.

According to Hobb, it can be assumed that, if a citizen confronts two gang members, the gang members will respond violently in defense of their turf, because the gang's reputation is at stake. A violent response would benefit the gang. Hobb strongly believed that defendant's crimes were committed for the benefit of ESBS. The violence escalated from a fistfight to discharging a gun against Jackson. Defendant and Gabriel's violent response demonstrated the gang's willingness to hurt others and warned the community of ESBS's presence in the community. It also showed that ESBS was not afraid to commit crimes and did not fear law enforcement.

III

PRELIMINARY HEARING TESTIMONY

Defendant contends that admitting into evidence Jackson and Davis's preliminary hearing testimony violated his constitutional rights to present a defense, confrontation, due process, cross-examination, compulsory process, and a fair trial. We disagree.

A. *Procedural Background*

During a pretrial hearing under Evidence Code section 402 (402 hearing), the prosecutor informed the court that Jackson and Davis were unavailable to testify at trial. Davis testified in this case at a preliminary hearing in December 2012,[4] and Jackson testified at a separate preliminary hearing in this case in April 2013. The prosecutor

_____

[4] Ramirez erroneously testified the preliminary hearing occurred in 2011, which would have been before the charged crimes occurred.

9

maintained that after Jackson and Davis testified at the preliminary hearings, they actively evaded service. The prosecution's investigator, Edward Ramirez of the district attorney's office, testified during the 402 hearing that he was asked in February 2013, to locate Jackson and Davis and took the following action.

**Jackson**

Ramirez discovered Jackson had moved after the subject shooting incident. Ramirez contacted Jackson before the preliminary hearing, at his new address in April 2013. During Ramirez's first contact with Jackson, Jackson refused to answer the door. He said he did not want to have anything to do with the case and wanted to be left alone. Jackson became belligerent. Ramirez left. A day or two later, two other investigators served Jackson with a subpoena, and Jackson agreed to appear in court. Ramirez took Jackson to court to testify at defendant's preliminary hearing. Jackson, who was cooperative, indicated he was willing to testify, and testified at defendant's preliminary hearing. Jackson was told at the preliminary hearing that he would be needed for trial.

In preparation for trial, the prosecutor asked Ramirez again to locate Jackson. Ramirez went to Jackson's last known residence and no one answered the door. No one appeared to be living at the residence. Ramirez left his business card at Jackson's home. A neighbor across the street said Jackson had moved away about two weeks before. Ramirez spoke to a supervisor at the U.S. Post Office, who indicated there was no forwarding address for Jackson.

Ramirez attempted to locate Jackson's wife. He searched various databases and checked them daily for new information regarding Jackson and his wife. Ramirez also

checked Jackson and his wife's Department of Motor Vehicles (DMV) records. Nothing produced a more recent residence address. Ramirez routinely checked jail records for Jackson and requested the Riverside County Sheriff's Department to notify him if there were any contacts with Jackson.

Jackson's wife, who is Native American Indian, receives funds from her tribe. Ramirez attempted to obtain information regarding Jackson's wife through the tribe but tribal members would not cooperate. Tribal police officer Gomez told Jackson that, even if Ramirez knocked on tribal members' doors, they would not talk to him or answer their doors.

Ramirez also went twice to Jackson's mother's home in Redlands. She told Ramirez she had nothing to do with her son and did not speak to him. She asked Ramirez to leave her property. Ramirez acknowledged he did not know if Jackson was actually actively evading service, since Jackson might not know Ramirez was looking for him.

**Davis**

Davis moved after the preliminary hearing. Ramirez's efforts to locate Davis after he moved included searching various databases. Ramirez routinely checked Davis's jail records to see if he was in custody. Ramirez also provided information on Davis to various law enforcement agencies, including the Banning task force and the deputy district attorney assigned to the reservation, to assist in locating him.

Ramirez met with the Morongo tribal police chief, and spent a day conducting surveillance on the Indian reservation, since Davis's wife, Jordan Davis, is Native American Indian. Ramirez discovered she received money from the tribe and had a home

11

on the reservation. Jordan's mother and other relatives also lived on the reservation. Ramirez met with the tribal police and went with them to Jordan's relatives' homes on the reservation. Ramirez and another investigator conducted four hours of surveillance where Jordan picked up her tribal check. Jordan did not appear during the surveillance. If a tribal check is not picked up, it is mailed to the member.

On the day of the surveillance, Ramirez provided the tribal police with photographs of Davis. The tribal police indicated they would try to locate Davis. When Ramirez spoke to the tribal police, he was told the tribal police would not provide any information because they did not trust law enforcement. Ramirez was told he was "spinning [his] wheels by talking to them." When Ramirez attempted to get the address used for disbursement of the tribal funds to Davis and Jordan, tribal officer Gomez told Ramirez he could not directly go to the person disbursing the funds and ask for Davis and Jordan's address. If he did ask, he would not be provided with an address. Gomez said he would try to obtain a list of addresses for Ramirez that same afternoon and immediately call Ramirez when he received it, but Gomez never called Ramirez back. The home Ramirez was told Jackson and Jordan were building on the reservation was merely a mailbox on the main road. There was no construction.

Ramirez checked three addresses for Davis provided by the Banning Police Department. At each address, people who occupied the residences told him Davis and his wife no longer lived there. Ramirez checked a post office box address for Jordan. The address was Jordan's mother's address on the reservation. Officer Gomez told Ramirez he was not permitted to go to Jordan's mother's address. Unless it was an emergency,

12

Ramirez had to be accompanied on the reservation by Officer Gomez when searching for someone. Gomez went to Jordan's mother's residence and then told Ramirez Jordan's mother's vehicle was not there. Gomez said it would be fruitless for Ramirez to try to talk to her because no one at Jordan's mother's home would talk to law enforcement.

Ramirez spoke to Davis's father six or seven times, from February 2013, up until a week before Ramirez's testimony at the 402 hearing in July 2013. Ramirez contacted Davis's father at Davis's last known address in Banning. Davis's father was not cooperative. He said he had not seen Davis since the shooting incident, which Ramirez did not believe. When asked for contact information for Davis, Davis's father said he had none. Twice Ramirez also spoke to Davis's grandmother who lived next door to Davis's father. She said she did not know where Davis was. Ramirez was unable to find out anything regarding Davis or Jordan's location. The cell phone numbers Ramirez was given for Davis and Jordan were no longer in service. Ramirez did not have any information on whether Davis and Jordan were employed.

Ramirez checked an address on Nicolet, which a police officer told Davis defendant frequently visited. Ramirez conducted surveillance there for two hours, with no results. Ramirez also conducted surveillance at Davis's father's home a few times for one to two hours but did not see Davis. Ramirez met with the Banning Police Department three or four times to see if they had seen Davis. Ramirez believed Davis was aware Ramirez was looking for him, and was actively avoiding service. Ramirez believed Davis was living with Jordan on the reservation.

13

**402 Hearing on Admissibility of Preliminary Hearing Testimony**

During the hearing on excluding Davis and Jackson's preliminary hearing testimony, the prosecution argued Ramirez had exercised due diligence in attempting to procure Davis and Jackson's attendance at trial but was unable to locate them. Therefore the witnesses were unavailable to testify at trial and their preliminary hearing testimony was admissible. The trial court concluded there was no additional information regarding Jackson and Davis's location and nothing further that could be done to find them. They might be on the Indian reservation but law enforcement could not search the reservation because of denial of access and lack of cooperation by the tribal police and tribal members. The court found that reasonable efforts were made to locate the witnesses. Therefore Jackson and Davis were unavailable as witnesses and their preliminary hearing testimony was admissible at trial under Evidence Code section 1291.

During the third day of trial, Jackson and Davis's preliminary hearing testimony was read to the jury. Later, the morning of July 9, 2013, the prosecutor informed the court that defense counsel had told him Jackson was in custody. Defense counsel informed the court Jackson was found at Banning Road Camp and was currently at the Larry Smith facility, with an arraignment scheduled for the following morning in department 63 of the Riverside Superior Court. The prosecutor offered to have his investigators bring Jackson to the court to speak with an investigator. The court indicated Jackson would testify the following day, when in court for arraignment on the other criminal matter. Later, in the afternoon on July 9, 2013, the prosecutor advised the court that, when his investigators went to pick up Jackson, they discovered he was not in the

14

Banning jail. He was arrested on June 25, 2013, and released that same day on bail. Jackson's bail bondsman told the prosecutor Jackson had given him a false address. However, Jackson was due in court on July 10, 2013.

The prosecutor requested closing arguments be continued one day to allow Jackson to testify in the case, after he appeared in court, in department 63, on July 10. The court agreed to continue closing argument until July 11, 2013. It was anticipated that during the morning of July 10, Jackson would testify after arraignment in department 63. If Jackson did not show up, the parties could proceed with closing argument.

On July 10, 2013, the prosecutor informed the court that defendant did not show up for arraignment in department 63. Jackson had two cases in Banning and had not been in court for two of his last three court appearances. Jackson was arrested on the Indian reservation. The court clerk in the instant matter was instructed to inform department 63 that, if Jackson appeared, the instant court needed to know immediately. If defendant did not appear in the Riverside courthouse by the time evidence was completed, jury instructions would be discussed and the parties would proceed with closing arguments.

After the close of evidence, the court informed the parties that, according to the clerk in department 63, Jackson did not appear for arraignment. The prosecutor stated his investigator went to the address Jackson had given his bail bondsman and the house was vacant, with a car next to the house covered in dust. After waiting there a couple of hours, the investigator concluded no one lived at the house.

Later, after a recess, the court informed the parties that Jackson appeared in court in Banning, not in department 63 in Riverside. Jackson indicated he had been in the

15

hospital and appeared in court in a hospital gown. His arraignment in Banning was continued. The court in Riverside advised counsel in the instant case that there was no warrant out for Jackson and, since he had not been ordered to appear for defendant's trial, the court did not have authority to issue a warrant for his appearance. The parties agreed to proceed with defendant's trial.

The following day, July 11, 2013, the court again told the parties that the court clerk in Banning had called and confirmed that Jackson had walked into the Banning courtroom on July 10 in a hospital gown, with his sister. He had left the hospital against the wishes of hospital personnel. His Coumadin levels were out of control and he was scheduled for surgery on July 11, for complications relating to his gunshot wound from the charged shooting incident. He intended to return to the hospital after leaving the Banning court. The court issued a warrant for defendant, pending until July 24, 2013. When the trial court in the instant case asked counsel if they wanted anything further done regarding Jackson, counsel said no. The trial thereafter continued to completion, with neither Jackson nor Davis appearing at trial.

B. *Applicable Law*

The confrontation clauses of the federal and state Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const. art. I, § 15.) "'"An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination. Under federal constitutional law, such testimony is admissible if the prosecution shows it made 'a good-faith effort' to obtain the presence of

16

the witness at trial." [Citations.]'" (*People v. Fuiava* (2012) 53 Cal.4th 622, 674-675 (*Fuiava*).)

Under Evidence Code section 1291, subdivision (a)(2), "[e]vidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (Evid. Code, § 1291, subd. (a)(2).) A witness is unavailable if "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).)

"Due diligence" is required under section 240. (See *Fuiava, supra,* 53 Cal.4th at p. 675.) "'[T]he term "due diligence" is "incapable of a mechanical definition," but it "connotes persevering application, untiring efforts in good earnest, efforts of a substantial character." [Citations.] Relevant considerations include "'whether the search was timely begun,'" [citation], the importance of the witness's testimony [citation], and whether leads were competently explored [citation].' (*People v. Cromer* (2001) 24 Cal.4th 899, 904.)" "'It is enough that the People used reasonable efforts to locate the witness.' [Citation.]" (*Fuiava,* at p. 677.) "'[T]he Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising.'" (*Ibid.*)

When the facts are undisputed, a reviewing court decides the question of due diligence independently, not deferentially. (*Fuiava, supra,* 53 Cal.4th at p. 675.)

17

Applying this standard of review, we conclude the trial court properly admitted Jackson and Davis's preliminary hearing testimony.

*C. Analysis*

Defendant's reliance on *People v. Sandoval* (2001) 87 Cal.App.4th 1425 (*Sandoval*) for the proposition the prosecution did not exercise due diligence in procuring Davis's and Jackson's attendance at trial, is misplaced. In *Sandoval*, the absent witness was deported to Mexico after testifying at the defendant's preliminary hearing. (*Id.* at p. 1432.) The witness told the prosecution he was willing to return for the trial if given money to make the trip to California. (*Ibid.*) The prosecution refused to provide financial assistance to the witness and did nothing further to secure his attendance at the trial. (*Ibid.*) Although the trial court had no authority to compel the witness's appearance at trial (*id.* at p. 1434), the *Sandoval* court noted the United States and Mexico had a treaty providing for cooperation in the prosecution of crimes and mutual assistance in obtaining witness testimony. (*Id.* at pp. 1439-1440.) The treaty included several cooperative methods by which a Mexican resident's testimony could be obtained, either in California or in Mexico. (*Id.* at p. 1439.) The *Sandoval* court stated that, "[A] good faith effort must be undertaken even though the court itself does not have the power to compel the attendance of the witness." (*Id.* at p. 1441.) The *Sandoval* court concluded that the prosecution's failure to pursue any of the cooperative methods provided in the treaty precluded a finding of good faith. (*Id.* at p. 1444.) The court thus held the absent witness residing in Mexico was not unavailable and therefore admitting his preliminary hearing testimony violated the defendants' constitutional right to confront witnesses.

18

(*Ibid.*)

Here, unlike in *Sandoval*, there was no evidence of any applicable treaty, accord, or agreement controlling extradition of witnesses or cooperation with local authorities. In addition, Jackson and Davis's current addresses were unknown. It was uncertain they even lived on the Indian reservation. The trial court in the instant case found Jackson and Davis unavailable, not because they resided on the reservation, which was foreign, sovereign territory, but because Ramirez could not locate the witnesses. Also, there was substantial evidence that, unlike in *Sandoval*, the witnesses were actively evading service and the prosecution had exercised due diligence in attempting to locate the two witnesses, to no avail. Unlike in *Sandoval*, here, the Indian tribe was not cooperative in assisting the prosecution in locating and making Jackson and Davis available.

Evidence establishing due diligence included Ramirez's testimony he visited Jackson and Davis's last known residences; conducted surveillance; contacted the witnesses' relatives, including Jackson's mother and Davis's father and grandmother; attempted to locate the witnesses' wives; checked with the post office and DMV for contact information; ran daily database searches for information regarding the witnesses and their wives; and enlisted the assistance from the tribal police in locating the witnesses and their wives. Ramirez's efforts to locate Jackson and Davis extended over a substantial period of time, up until the trial in July 2013. Even though there may have been additional acts Ramirez could have taken to locate Jackson and Davis, we conclude Ramirez's efforts to locate the two witnesses were reasonably diligent and in good faith. The prosecution was not required to do everything possible to procure Jackson and

19

Davis's attendance at trial; "it was only required to use reasonable diligence."  (*People v. Lopez* (1998) 64 Cal.App.4th 1122, 1128.)

Defendant further argues that when Jackson was located midtrial, the prosecution failed to urge the trial court immediately to arrange for his seizure under section 1332. Section 1332, subdivision (a), provides in relevant part that "when the court is satisfied, by proof on oath, that there is good cause to believe that any material witness for the prosecution or defense, whether the witness is an adult or a minor, will not appear and testify unless security is required, at any proceeding in connection with any criminal prosecution . . . the court may order the witness to enter into a written undertaking to the effect that he or she will appear and testify at the time and place ordered by the court or that he or she will forfeit an amount the court deems proper."

Defendant asserts that the prosecution should have urged the court to contact Jackson's attorney and request assistance in producing Jackson.  Defendant also argues the prosecutor should have urged the court to contact the Banning court and arrange for Jackson's detention and an undertaking or at least identify the hospital where Jackson was receiving treatment.  Although these were actions the prosecutor could have requested, the prosecutor's failure to do so does not demonstrate a lack of due diligence under the circumstances in this case, particularly since defense counsel was equally capable of requesting such measures, and did not do so.

Even if the prosecutor made such requests, it is unlikely the trial court would have ordered Jackson detained for purposes of testifying at trial since Jackson was in poor health and would have been unavailable to testify in the near future because he was

currently hospitalized, the hospital staff had advised him not to leave the hospital, and he was scheduled for surgery on July 11, which was when closing argument was scheduled. Any orders mandating Jackson appear in court to testify would have required delaying completion of the jury trial until after Jackson recovered from his surgery.

Furthermore, the discovery of Jackson's location occurred near the end of defendant's trial, after Jackson and Davis's preliminary testimony had already been read to the jury. The trial court nevertheless attempted to arrange for Jackson's testimony immediately upon being informed Jackson had been located. The prosecutor made every effort to cooperate and agreed to accommodate scheduling Jackson's testimony before concluding the trial. It was initially believed that Jackson would appear for arraignment in the same courthouse where the trial was pending in the instant case and therefore would be available to testify in the trial. Arrangements were accordingly made to postpone closing argument and jury instructions. However, Jackson unexpectantly showed up in the Banning courthouse, rather than the Riverside courthouse, and was in poor health, with surgery scheduled the following day, which was the final day of defendant's trial. At that point, both parties indicated they did not wish to take any further action to force Jackson to testify. Under such circumstances, admission of Jackson and Davis's preliminary hearing testimony did not violate defendant's constitutional rights.

IV

SUFFICIENCY OF EVIDENCE OF CHARGED CRIMES

Defendant contends there was insufficient evidence identifying him as the

21

perpetrator of the charged crimes. Defendant argues that the only identification evidence consisted of police detective David Loera conducting infield show-ups at the police station. Davis identified defendant and Gabriel as the two perpetrators. Davis identified defendant as the shooter, stating, "'I'm pretty sure that's him.'" "'It was dark.'" However, at the preliminary hearing, Davis recanted his identification. He testified he could not see anyone because "[i]t was really dark and it happened so quick." Jackson testified at the preliminary hearing that he was positive defendant was not the shooter and that he could recognize defendant because he went to school with defendant. Jackson described him as a "good guy" and said he was not a gang member. Defendant notes there was no evidence connecting the .45-caliber gun to defendant or that Jackson was shot with the gun.

## A. *Standard of Review*

"'In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, the question we ask is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."' [Citations.] We apply an identical standard under the California Constitution. [Citation.] 'In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court "must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."' [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1175.)

When reviewing the sufficiency of the evidence, "a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young, supra,* 34 Cal.4th at p. 1181.) A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

*B. Analysis*

There was substantial evidence supporting the jury's finding defendant was the perpetrator of the charged crimes. Police detective Loera testified at trial that he conducted infield show-ups at the police station, during which Davis identified defendant and Gabriel as the two perpetrators. Davis further identified defendant as the shooter and said, "'I'm pretty sure that's him.'" This evidence alone was sufficient to support the jury's finding that defendant was the perpetrator of the charged crimes. (*People v. Cuevas* (1995) 12 Cal.4th 252, 263-275 (*Cuevas*).)

Even though during the preliminary hearing Davis contradicted his out-of-court identification and claimed he could not identify the shooter, such inconsistent testimony was suspect. Davis's preliminary hearing testimony described in detail the events leading up to and during the shooting. Yet, when he was asked to identify the shooter, Davis was suddenly unable to provide any details whatsoever. He stated, "I'm not too sure. I can't identify nobody. [¶] . . . [¶] It was really dark and it happened so quick."

23

When determining the sufficiency of evidence of an uncorroborated out-of-court identification, this court should consider "the many varied circumstances that may attend an out-of-court identification and affect its probative value. These circumstances include, for example: (1) the identifying witness's prior familiarity with the defendant; (2) the witness's opportunity to observe the perpetrator during the commission of the crime; (3) whether the witness has a motive to falsely implicate the defendant; and (4) the level of detail given by the witness in the out-of-court identification and any accompanying description of the crime. (See also CALJIC No. 2.92 (5th ed. 1988) [listing factors relevant to reliability of eyewitness identification].)" (*Cuevas, supra,* 12 Cal.4th at p. 267.)

Davis may not have had prior familiarity with defendant but the evidence shows that he had ample opportunity to observe defendant as he, Jackson, and David drove up to defendant and Gabriel on the street. The jury could reasonably infer that Davis saw defendant before, during, and/or after defendant shot Jackson. There was little, if any, evidence that Davis had a motive to falsely implicate defendant. In addition, Davis's description of the events leading up to, during, and after the shooting was detailed.

Circumstances this court considers when a witness fails to identify the defendant at trial, include: "(1) whether the identifying witness admits, denies, or fails to remember making the out-of-court identification; (2) whether the witness remembers the underlying events of the crime but no longer believes in the accuracy of the out-of-court identification; (3) whether, if the witness claims the identification was false or erroneous, the witness offers an explanation for making a false or erroneous identification; (4)

24

whether, if the witness claims a failure of recollection, there are reasons supporting the loss of memory; (5) whether there is evidence that the witness's failure to confirm the identification in court resulted from the witness's appreciation that doing so would result in the defendant's conviction; or (6) whether there is evidence that, as the Attorney General suggests occurred here, the witness's failure to confirm the identification arises from fear or intimidation." (*Cuevas, supra,* 12 Cal.4th at pp. 267-268.)

At the preliminary hearing, Davis admitted identifying defendant during the out-of-court identification but, during the preliminary hearing, said he no longer believed in the accuracy of the identification because he based it on defendant's clothing and was scared. However, when asked at trial what clothes defendant and Gabriel were wearing, defendant said he did not know, "I'm not too sure. Probably black – black, white, gray. I'm not sure." Furthermore, during Davis's out-of-court identification of defendant, Davis did not mention defendant's clothing.

Davis did not testify his identification was false and he did not explain why he identified defendant right after the incident but could not do so at the preliminary hearing. Davis merely said, "I'm not too sure. I can't identify nobody." He added, it was dark and the crime "happened so quick." Davis did not claim any loss of memory and described the incident in detail. There was no evidence Davis was aware his identification would result in defendant's conviction but this was relatively apparent. Furthermore, since defendant and Gabriel were known gang members, there would be reason for Davis to fear identifying them as perpetrators, particularly after defendant's brutal shooting of Jackson.

25

In addition to Davis's identification of defendant as the perpetrator, there was substantial corroborating evidence establishing that defendant shot Jackson. Jackson testified at the preliminary hearing that the man who shot him was not the man who was fighting with David. Officer Segura testified at trial that Jackson and Davis said David confronted two individuals and, while fighting one of the two men, the other man fired the gun. Gabriel testified at trial that he had pled guilty in the instant case to "[a]ssault to fighting." Gabriel acknowledged he had a bump on his face which he believed was from fighting during the shooting incident. Additional evidence defendant was the individual who fired the gun, included testimony that shortly after the shooting, defendant and Gabriel were seen running to Saubel's home and the police found defendant inside Rosanna Saubel's home. The police also found a gun hidden in a laundry basket in the home and Gabriel was apprehended in Saubel's back yard. The jury could reasonably infer from this evidence that Gabriel was the individual fighting David and defendant fired the gun at Jackson.

The evidence as a whole, including Loera's testimony that Davis identified defendant as the shooter, was sufficient to support the jury's finding that defendant was the perpetrator of the charged crimes.

V

GANG ENHANCEMENT INSTRUCTION

The jury found true the gang enhancements on counts 1 and 2. Defendant contends that, when instructing on the gang enhancements, the trial court erred in failing to instruct the jury sua sponte on the meaning of the phrase, "in association with a

26

criminal street gang." The trial court gave CALCRIM No. 1401 on the elements of the criminal street gang enhancement but there was no definition of the phrase, "in association with a criminal street gang."

The jury was instructed on the elements of the criminal street gang enhancement pursuant to CALCRIM No. 1401 in relevant part as follows: "To prove this allegation, the People must prove that: [¶] 1. The defendant committed the crime for the benefit of, at the direction of or *in association with a criminal street gang;* [¶] AND [¶] 2. The defendant intended to assist, further, or promote criminal conduct by the gang members." (Italics added.)

Defendant argues that under *People v. Albillar* (2010) 51 Cal.4th 47, 60-62 (*Albillar*), "in association with a criminal street gang" is a legal term with a specific definition which the trial court must define for the jury. In response, the People argue CALCRIM No. 1401 sufficiently instructed the jury on the law and no further instruction was required absent a request.

"The trial court has a sua sponte duty to give correct instructions on the basic principles of the law applicable to the case that are necessary to the jury's understanding of the case. [Citation.] That duty requires the trial court to instruct on all the elements of the charged offenses and enhancements. [Citation.]" (*People v. Williams* (2009) 170 Cal.App.4th 587, 638–639 [Fourth Dist., Div. Two].) When the terms are used as commonly understood, the court has no obligation to define them absent a request for amplification or explanation.

Citing *Albillar, supra,* 51 Cal.4th at page 60, defendant asserts that the term "'in association with any criminal street gang' requires a showing that [he] 'relied on . . . common gang membership and the apparatus of the gang in committing' the charged crime." In *Albillar,* three fellow gang members were convicted of forcible rape and forcible sexual penetration, while acting in concert. In rejecting the defendants' contention that there was insufficient evidence that the sexual offenses were committed in association with the defendants' gang, the Supreme Court relied on the gang expert's testimony regarding gang membership and reasons for gang members committing crimes. (*Albillar, supra,* 51 Cal.4th at pp. 60-61.)

Applying the evidence to the expert's testimony, the *Albillar* court concluded, "Defendants not only actively assisted each other in committing these crimes, but their common gang membership ensured that they could rely on each other's cooperation in committing these crimes and that they would benefit from committing them together. They relied on the gang's internal code to ensure that none of them would cooperate with the police, and on the gang's reputation to ensure that the victim did not contact the police. We therefore find substantial evidence that defendants came together as *gang members* to attack [the victim] and, thus, that they committed these crimes in association with the gang. [Citations.]" (*Albillar, supra,* 51 Cal.4th at pp. 61-62.)

The *Albillar* court did not provide a new definition for the phrase "in association with any criminal street gang," or hold that the phrase has a technical meaning requiring sua sponte instruction in future cases. The court in *Albillar* merely discussed the sufficiency of the evidence in establishing the elements of the criminal street gang

28

enhancement. The trial court does not have a duty under *Albillar* to define, sua sponte, the phrase, "in association with any criminal street gang." Since in the instant case, defense counsel did not request instruction on the meaning of the phrase, "in association with a criminal street gang," the trial court did not commit instructional error by not defining the phrase.

## VI

## SUFFICIENCY OF EVIDENCE OF GANG ENHANCEMENTS

Defendant contends there was insufficient evidence to support the gang enhancements on counts 1 and 2. Imposing a gang enhancement requires substantial evidence the defendant committed the underlying felony (1) "for the benefit of, at the direction of, or in association with any criminal street gang," and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) Defendant contends there was insufficient evidence establishing these elements. We disagree.

Evidence defendant committed the charged offenses for the benefit of and in association with a gang included evidence defendant committed the crimes with another gang member, Gabriel, who pled guilty to fighting during the shooting incident. There was also gang expert testimony by Detective Hobb, establishing that defendant and Gabriel were active members of the ESBS gang and that defendant's crimes were committed for the benefit of his gang. It is well settled that a trier of fact may rely on expert testimony about gang culture and habits to reach a finding on a gang allegation. (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930.) California law permits a person

29

with "'"special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness (Evid. Code, § 720) and give testimony in the form of an opinion (*id.,* § 801).'" (*In re Frank S.* (2006) 141 Cal.App.4th 1192, 1196 (*Frank S.*).)

Defendant cites *Frank S., supra,* 141 Cal.App.4th 1192 for the proposition the prosecution failed to prove the first gang-related prong. In *Frank S.*, police stopped a minor for riding his bicycle through a red light. The juvenile court found true allegations that the minor was carrying a concealed knife, was in possession of methamphetamine, and made a false representation to a peace officer. The minor challenged on appeal, on sufficiency of evidence grounds, the gang enhancement allegation that the minor possessed the knife for the benefit of his gang. The *Frank S.* court reversed the gang enhancement, holding that "crimes may not be found to be gang-related based solely upon a perpetrator's criminal history and gang affiliations." (*Frank S., supra,* 141 Cal.App.4th at p. 1195.)

The instant case is distinguishable from *Frank S.* in that in the instant case there was evidence defendant was with another gang member, Gabriel, when he committed the charged offenses. Defendant shot Jackson while Gabriel was fighting with David, after Jackson, David, and Davis accused defendant and Gabriel of trespassing on Jackson and David's property. Defendant and Gabriel were both seen fleeing together from the shooting scene and shortly afterwards were apprehended on Saubel's property.

There was also expert testimony, unlike in *Frank S.*, that defendant and Gabriel's acts of fighting David and shooting Jackson, was typical gang-related retaliation to confrontation, committed for the benefit of defendant's gang and with intent to promote

30

it. As Hobbs explained, if gang members are confronted by citizens, it is typical for gang members to react violently, and such a response would benefit the gang. In the culture of gangs, such confrontation could not go unavenged and would warrant a retaliatory strike. By reacting violently, defendant and Gabriel enhanced their gang's reputation in the community and encouraged citizens to leave their gang alone, through intimidation and fear. Furthermore, "[c]ommission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime." (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322 [Fourth Dist., Div. Two].)

## VII

## SENTENCING ERROR

The People do not oppose defendant's contention his sentence on count 3 (participation in a street gang (§ 186.22, subd. (a)) must be stayed under section 654. The trial court imposed a consecutive term on count 3 of one year four months.

Under *People v. Mesa* (2012) 54 Cal.4th 191, 193, section 654 precludes punishment for both participation in a street gang (§ 186.22, subd. (a)) and underlying felonies (assault with a firearm and possession of a firearm by a felon), which transform mere gang membership (a noncrime) into the crime of actively participating in a criminal street gang. On resentencing, the sentence on count 3 must be stayed. (See *People v. Ahmed* (2011) 53 Cal.4th 156, 164 [section 654 "bars multiple punishment for the same

*aspect* of a criminal act."].)  Defendant cannot suffer multiple punishments for active gang participation and the underlying felonies.  (*Mesa,* at pp. 197-198.)

VIII

DISPOSITION

The judgment is ordered modified to stay the one-year-four-month sentence on count 3 (participation in a street gang) under section 654.  In all other regards, the judgment is affirmed.  The trial court is directed to prepare a corrected abstract of judgment and to forward it to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:


RAMIREZ
P. J.


McKINSTER
J.