Filed 5/21/15  P. v. Lucero CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DANNY RAY LUCERO,<br><br>    Defendant and Appellant. | F067423<br><br>(Super. Ct. No. F11906605)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Peggy A. Headley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Danny Ray Lucero appeals from a judgment entered upon his convictions for assault with a deadly weapon and his acknowledgement of a prior serious felony conviction.  He claims the trial court erred by ruling that a material witness was

unavailable to testify at trial and by refusing to allow defense counsel to present evidence of his blood alcohol level at the time of the offenses. An additional claim is asserted on grounds of insufficient evidence. Finally, Lucero alleges that the trial court abused its discretion by declining to strike his prior serious felony conviction for purposes of sentencing. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Lucero was charged by information with two felony counts of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1)) allegedly committed against Gilbert Quevedo (Count 1) and Tina Jackson-Karanja (Count 2). Enhancement allegations were attached to these charges for personal use of a dangerous and deadly weapon within the meaning of sections 667 and 1192.7. It was further alleged that Lucero had suffered a prior serious felony conviction for purposes of section 667, subdivision (a)(1), and California's "Three Strikes" law (§§ 667, subds. (b) - (i), 1170.12, subds. (a) - (d)). The case proceeded to a jury trial in January 2013.

Prosecution Evidence

Evidence of Lucero's assault against Gilbert Quevedo was presented to the jury through a reading of the transcript of Mr. Quevedo's preliminary hearing testimony. The victim was believed to be living in Mexico at the time of trial. The trial court permitted use of the transcript in lieu of live testimony after determining that Mr. Quevedo was legally unavailable. The factual basis for this ruling is discussed later in the opinion.

Mr. Quevedo had a job that involved retrieving and returning shopping carts to grocery stores. On November 15, 2011, at approximately 3:00 p.m., he encountered a man whom he identified in court as Lucero while pulling carts out of a canal near Valentine Avenue in Fresno. Lucero accosted Mr. Quevedo and pointed a knife at him in a threatening manner. Frightened by Lucero's behavior, Mr. Quevedo let go of the cart

---

[1] Statutory references are to the Penal Code unless otherwise specified.

2.

that he was holding and ran into the canal. Lucero tried to chase him but slipped and fell, at which point Mr. Quevedo turned around and ran back to his truck which was parked nearby. Lucero swung the knife at Mr. Quevedo as he was heading towards the road, then pursued him again, reaching the truck shortly after the victim had jumped inside and rolled up the windows. Lucero struck the driver's side window with his fist before the vehicle drove away.

Timothy Williamson testified to seeing Lucero attack several motorists between approximately 3:00 p.m. and 3:30 p.m., apparently after the incident with Mr. Quevedo had occurred. The witness was standing in front of his office between Gettysburg and Marty Avenues when he observed Lucero strike or attempt to strike the windshield of a sedan with a knife. Mr. Williamson got into his own vehicle and followed Lucero while calling 911 on his cell phone to report what was happening. Lucero proceeded down Marty Avenue, which turned into Valentine Avenue, and then "darted across the street" into moving traffic. He confronted at least one other driver before making his way to Holland Avenue. According to Mr. Williamson, Lucero was "attacking any person that seemed to be in sight at that time."

While parked at the corner of Holland and Marty/Valentine, Mr. Williamson watched as Lucero "charged" towards a woman who was entering a light brown minivan and struck the vehicle with his knife as soon as she closed the door. Mr. Williamson's account of this incident matched that of Maria Garza, who testified that a co-worker named Tina [Jackson-Karanja] had jumped into her beige Chrysler Town and Country minivan near the corner of Holland and Valentine in order to get away from Lucero.

Ms. Jackson-Karanja was unable to identify the defendant in court, but attested to being approached by a man with a knife on the day in question. The victim noticed the man coming towards her as she was walking to the corner of Holland and Valentine. She reacted by flagging down Ms. Garza, who picked her up in a "tannish" colored van.

3.

Ms. Jackson-Karanja estimated that the man with the knife was within six feet of her when she entered the van.

Police apprehended Lucero following a brief chase that began near the intersection of Holland and Valentine. Lucero had been carrying a 10-inch hunting knife, which he attempted to discard moments before being caught by the arresting officers. A photograph of the knife was admitted into evidence.

Defense Evidence

Lucero testified that he had been living in a tent near a canal on the day of his arrest. He started drinking a bottle of brandy at approximately 10:30 that morning and found himself handcuffed to a hospital bed nearly 12 hours later, with no memory of what had happened in the interim. He admitted owning the knife depicted in the prosecution's photograph.

Liliana Rubio was called to testify regarding her observations of Lucero's behavior around the time of the alleged assaults. She had witnessed him jump in front of several cars along Ashlan Avenue, including her own. He was carrying a knife and fell down repeatedly as he moved. Ms. Rubio called 911 to report the incident out of concern for Lucero's safety.

Verdict and Sentencing

The jury returned guilty verdicts on both counts. Lucero admitted to having a prior serious felony conviction for burglary, but moved to have the prior conviction stricken for purposes of sentencing. The motion was denied. (See discussion, *infra*.)

Lucero was sentenced to an aggregate term of 11 years in prison. His sentence was based on the mitigated term of two years for Count 1, doubled to four years and enhanced by an additional five years pursuant to sections 667 and 1170.12, plus a consecutive two-year term under Count 2 (constituting one-third of the middle term for that count). A timely notice of appeal was filed on June 7, 2013.

4.

## DISCUSSION

**Witness Availability (Count 1)**

Lucero contends that the trial court erred by declaring Gilbert Quevedo unavailable as a witness and thus allowing Mr. Quevedo's preliminary hearing testimony to be read to the jury. The issue is framed as a constitutional challenge based on the alleged deprivation of appellant's right to confrontation under state and federal law. To resolve this claim, we must determine whether the prosecution made reasonable and good faith efforts to secure the witness's attendance at trial.

Background

The preliminary hearing was held on January 24, 2012. Mr. Quevedo testified as a prosecution witness and was cross-examined by Lucero's defense counsel. The jury trial commenced approximately one year later on January 22, 2013.[2]

The prosecution made its first attempt to serve Mr. Quevedo with a trial subpoena on October 26, 2012. This task was delegated to Brian Poulsen, who worked as a special investigator for the district attorney's office. Mr. Poulsen tried to effectuate personal service at the witness's last known address - an apartment located on South Maple Avenue in Fresno - but no one answered the door when he knocked. Upon speaking to the manager of the apartments, Mr. Poulsen was told there were no tenants named Gilbert Quevedo living in the complex. The investigator also travelled to a residence on East Iowa Avenue to pursue a potential lead he had received from colleagues in his office, but was unable to establish contact with anyone at that address.

---

[2] According to the record, trial was originally scheduled to begin on October 29, 2012. The proceedings were continued to November 9, 2012 at the request of the prosecution, and continued again until December 10, 2012 pursuant to a request by defense counsel. A subsequent defense motion to reset the trial date pushed the matter out until January 14, 2013, and that date was briefly continued to accommodate the prosecutor's simultaneous obligations in another department of the trial court.

5.

On January 4, 2013, Mr. Poulsen returned to the apartment complex on South Maple Avenue and spoke to a different manager about his investigation. This individual was acquainted with the Quevedo family and had been informed that Gilbert was now living in Mexico. The manager provided a telephone number for one of Gilbert's relatives and referred Mr. Poulsen to the same address on East Iowa Avenue that he had visited in October. When Mr. Poulsen went back to the residence on East Iowa, a female occupant told him that Gilbert Quevedo relocated to Mexico in April 2012 and would not be returning due to his inability to legally reside in the United States. The woman provided a phone number for someone named Dagoberto Luque, whom she said could verify that Mr. Quevedo had left the country. The investigator called the number and left a message, which was not returned.

Mr. Poulsen reached Dagoberto Luque by phone on January 7, 2013. The man identified himself as Gilbert Quevedo's brother and said that Mr. Quevedo had moved to the city of Guasave in Sinaloa, Mexico. He provided a telephone number where his brother could be reached, but gave no address. Beginning on January 16, 2013, Mr. Poulsen made four attempts to call Mr. Quevedo in Mexico. None of the calls went through. On every attempt, the investigator was connected to a recorded operator message which said something to the effect of, "The phone number you have called cannot be reached at this time."

During the week before trial, a senior investigator from the district attorney's office named Kevin Wiens contacted the Department of Homeland Security's Immigration and Customs Enforcement agency (ICE) and spoke to an agent regarding Gilbert Quevedo's legal status. He was told Mr. Quevedo had been deported two times, most recently pursuant to an order issued by a Nevada court in 2010. Thus, the witness had presumably been in the country illegally in 2011 and 2012, but there was no evidence of the prosecution being aware of those circumstances prior to January 2013. The ICE did not have any information regarding Mr. Quevedo's current whereabouts.

6.

Based on the evidence summarized above, the trial court found (1) Mr. Quevedo was unavailable for purposes of Evidence Code section 1291; (2) Lucero was given the opportunity to cross-examine the witness at his preliminary hearing; and (3) Lucero had the same interest and motive for cross-examination at that time as he would have at trial. The court noted the witness was beyond the reach of its process and could not be compelled by subpoena to attend the trial. Acknowledging the constitutional implications of admitting the preliminary hearing testimony, the court further determined that the prosecution had acted in good faith and made reasonable efforts to secure Mr. Quevedo's presence.

Analysis

A criminal defendant's right to confront and cross-examine adverse witnesses is guaranteed by our state and federal constitutions. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) There are limitations to this right when the adverse witness is unavailable and has given testimony against the defendant in a prior judicial proceeding which was subject to cross-examination. (*People v. Herrera* (2010) 49 Cal.4th 613, 621 (*Herrera*).) California has codified this exception in Evidence Code section 1291, subdivision (a)(2), which "provides that 'former testimony,' such as preliminary hearing testimony, is not made inadmissible by the hearsay rule if 'the declarant is unavailable as a witness,' and '[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.' Thus, when the requirements of section 1291 are met, the admission of former testimony in evidence does not violate a defendant's constitutional right of confrontation." (*Herrera*, *supra*, 49 Cal.4th at p. 621, fn. omitted.)

State law requirements for establishing the unavailability of a witness are set forth in Evidence Code section 240. When a trial court has the power to compel the witness's attendance by its process, he or she is considered unavailable only when their absence

7.

from a hearing occurs after "reasonable diligence" has been exercised to ensure their appearance. (Evid. Code, § 240, subd. (a)(5).) Reasonable diligence "'connotes persevering application, untiring efforts in good earnest, [and] efforts of a substantial character.'" (*People v. Cromer* (2001) 24 Cal.4th 889, 904 (*Cromer*).) If the witness is shown to be in a location beyond the reach of the court's process, absence from the hearing alone constitutes unavailability. (Evid. Code, § 240, subd. (a)(4).) "In contrast to section 240(a)(5), section 240(a)(4) makes no mention of a 'reasonable diligence' requirement, thus indicating the Legislature's intent to dispense with such a showing in those cases where the court has no power to compel the witness's attendance." (*Herrera*, *supra*, 49 Cal.4th at pp. 622-623.)

Even if a witness is shown to be unavailable within the meaning of Evidence Code section 240, subdivision (a)(4), the Sixth Amendment requires the prosecution to make a good faith effort to procure his or her appearance. (*Herrera*, *supra*, 49 Cal.4th at pp. 622-623.) "The United States Supreme Court has described the good faith requirement this way: 'The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness'[s] intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness.'" (*Herrera*, *supra*, 49 Cal.4th at p. 622.)

It is the prosecution's burden to establish the unavailability of a witness and the good faith nature of its efforts to produce him or her in court. (*Ohio v. Roberts* (1980) 448 U.S. 56, 74-75, overruled on other grounds in *Crawford v. Washington* (2004) 541 U.S. 36; *People v. Smith* (2003) 30 Cal.4th 581, 609.) The issue presents a mixed question of fact and law. Factual determinations concerning the efforts made to produce

the witness are reviewed for substantial evidence. The de novo standard of review is applied to the legal question of whether such facts demonstrate good faith and reasonable diligence. (*Herrera*, *supra*, 49 Cal.4th at p. 622.)

The parties do not dispute the relevant facts regarding the prosecution's efforts to find Gilbert Quevedo. Mr. Poulsen made multiple trips to two locations in Fresno and spoke to at least four different people about the witness's current location and contact information. He pursued each lead that was uncovered, culminating in a series of failed attempts to call an international telephone number that was given to him by an ostensibly reliable source. Viewed objectively, this evidence is more suggestive of a good faith attempt to locate the witness rather than of some elaborate charade performed without any real intention of contacting Mr. Quevedo or persuading him to appear at trial.

Lucero criticizes the investigator's inactivity between October 26, 2012 and January 4, 2013, arguing this demonstrates his incompetence and lack of due diligence. Those facts are certainly relevant, but not dispositive of the issue. The suspension of search efforts was likely attributable in part to the trial continuances that were ordered during this time period (the bulk of which appear to have been requested by the defense) and the fact that a settlement conference remained pending until the first week of December. In any event, the failure to initiate aggressive search efforts until weeks or even days before trial is not unreasonable as a matter of law. (See, e.g., *People v. Hovey* (1988) 44 Cal.3d 543, 564 [reasonable diligence found where investigators began search for witness one month before trial testimony was needed]; *People v. Saucedo* (1995) 33 Cal.App.4th 1230, 1236, disapproved on another point by *Cromer*, *supra*, 24 Cal.4th 889, 901, fn. 3 [reasonable diligence found where search for witness began one week before trial].) Lucero cites *Herrera, supra,* in support of his untimeliness argument, but there the California Supreme Court found the government acted with reasonable diligence under circumstances where its search for a witness began only five days before trial, whereupon investigators discovered that the man had been deported eight months earlier.

9.

(*Herrera*, *supra*, 49 Cal.4th at pp. 618-620, 628-629.) In this case, the prosecution did not have reason to believe Mr. Quevedo had left the country until January 2013. As such, the investigative efforts from January 4, 2013 to January 22, 2013 are more probative of the diligence issue and show, on balance, that the prosecution acted reasonably and in good faith.

Lucero also points out that despite receiving a phone number for Mr. Quevedo on January 7, 2013, Mr. Poulsen waited until January 16, 2013 before attempting to call him. At trial, Mr. Poulsen testified that not all phones at the district attorney's office were capable of making international calls, and it took him "a couple of days" to find a phone from which the call could be placed. However dubious this explanation may seem, it is significant that during approximately the same time period the prosecution assigned a second investigator to pursue other potential leads with ICE. We are thus satisfied that the district attorney's office remained proactive in its search for Mr. Quevedo and behaved reasonably under the totality of the circumstances.

Finally, appellant claims the prosecution should have done more to try to reach Mr. Quevedo by phone and was obligated to pursue options under an international treaty with Mexico to obtain his trial testimony. These arguments do not change our conclusion that the prosecution's efforts were reasonable and performed in good faith. "That additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. [Citation.] It is enough that the People used reasonable efforts to locate the witness." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1298.) "[W]hen a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness'[s] presence [citation], but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." (*Hardy v. Cross* (2011) 565 U.S. ___, ___ [132 S.Ct. 490, 495] (per curiam).)

10.

Regarding the possible invocation of an international treaty with Mexico, the facts in this case are distinguishable from those in *People v. Sandoval* (2001) 87 Cal.App.4th 1425 (*Sandoval*), which is cited in Lucero's briefs.  In *Sandoval*, a trial court found a material witness to be unavailable based solely on the fact that he was a Mexican citizen who was residing in Mexico at the time of trial.  (*Id.* at p. 1443.)  The witness had been deported after testifying at the defendant's preliminary hearing.  (*Id*. at p. 1432.)  A prosecution investigator subsequently contacted the witness by telephone, and the man expressed his willingness to travel back to the United States to testify in court if the district attorney's office would pay estimated expenses of $100 for him to obtain a passport and visa, and also cover the cost of his travel to California.  The prosecution declined to provide any financial assistance to the witness and abandoned its efforts to secure his attendance at trial.  (*Ibid*.)

In reversing the *Sandoval* defendant's conviction on Sixth Amendment grounds, the Third District observed that the United States has a treaty with Mexico which addresses diplomatic cooperation in criminal matters.  (*Sandoval*, *supra*, 87 Cal.App.4th at pp. 1438-1440.)  The treaty contains a provision that "allows the prosecution to request the assistance of Mexican authorities to invite a person in Mexico to come to California and testify and to inform the person concerning the extent to which expenses will be paid."  (*Id*. at pp. 1438-1439, fn. omitted.)  Since the witness had already been located and provided assurances that he would return to the jurisdiction to testify, the prosecution could have attempted to invoke the treaty or, alternatively, just given the witness the money he needed to travel to California.  (*Id*. at pp. 1441-1442.)  Instead, the prosecution "threw up its hands and asserted [that the witness] was unavailable simply because he was a foreign citizen residing outside of the United States."  (*Id*. at p. 1443.)

Here, the prosecution was unable to obtain reliable contact information for Mr. Quevedo despite a variety of investigatory efforts, and would have had little information to provide to Mexican authorities even if such individuals or agencies were willing to

provide their assistance. The witness was found to be unavailable not simply because the court believed he was in Mexico at the time of trial, but because good faith efforts to locate him had proven fruitless. Accordingly, we reject Lucero's claim that his constitutional right of confrontation was violated.

**Sufficiency of the Evidence (Count 2)**

Lucero asserts that the evidence was insufficient to support his conviction for assault with a deadly weapon against Tina Jackson-Karanja as alleged in Count 2. The standard of review for this claim is deferential to the verdict. (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) "[T]he reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) Reversal is not warranted unless the evidence is insufficient to support the verdict under any hypothesis. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

A conviction for assault with a deadly weapon requires proof of the crime of assault, plus proof that it was accomplished by the use of a deadly weapon. An assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) Lucero does not deny he was in possession of a deadly weapon at the time of the incident, but argues his conduct did not satisfy the actus reus requirement. We conclude otherwise.

As the California Supreme Court has explained, "'Holding up a fist in a menacing manner, drawing a sword, or bayonet, [or] presenting a gun at a person who is within its range, have been held to constitute an assault. So, *any other similar act*, accompanied by such circumstances as denote an intention existing at the time, *coupled with a present ability of using actual violence against the person of another*, will be considered an assault.'" (*People v. Colantuono* (1994) 7 Cal.4th 206, 219, second italics added.) A

12.

person has the present ability to use violence against someone if he or she "'has attained the means and location to strike immediately.'" (*People v. Chance* (2008) 44 Cal.4th 1164, 1168 (*Chance*).) "In this context, however, 'immediately' does not mean 'instantaneously.' … [A]n assault may be committed even if the defendant is several steps away from actually inflicting injury, or if the victim is in a protected position so that injury would not be 'immediate,' in the strictest sense of that term." (*Ibid*.)

According to Lucero, the evidence merely shows he "approached [the victim] while holding a knife." His arguments fail to construe the record in the light most favorable to the judgment. Timothy Williamson testified that Lucero was "running towards people" with a knife in his hand and "charged" at Ms. Jackson-Karanja just before she entered Ms. Garza's automobile. From Mr. Williamson's perspective, the victim made it into the van "within split seconds of him getting in contact with her." Ms. Garza testified that Lucero had the knife raised to shoulder level with the blade pointed in front of him. From these accounts the jury could reasonably infer that Lucero was poised to strike the victim with his knife and was closing in fast when she jumped inside of the vehicle. Crediting the victim's testimony that Lucero was within six feet of her when she closed the door, we find substantial evidence in the record to fulfill the required elements of the offense.

**Evidence of Voluntary Intoxication (Counts 1 & 2)**

Lucero challenges the trial court's decision to exclude evidence of his blood alcohol levels on the day of his arrest, which were said to be as high as .355 percent. The defense purportedly believed that establishing Lucero's extreme intoxication would operate to negate the required mens rea of the charged offenses. On appeal, the parties seem to agree that California Supreme Court precedent requires us to uphold the trial court's ruling. Lucero makes his arguments for the stated purpose of preserving the issue for further appellate review. In that regard, he submits that exclusion of the evidence violated his constitutional right to present a defense. To the extent the statements in

13.

Lucero's briefs do not amount to a full concession of the issue for purposes of this appeal, we reject his claim as meritless for the following reasons.

"Assault with a deadly weapon requires proof of an intentional act committed with knowledge of facts that would lead a reasonable person to realize that physical force would be applied to another as a direct and probable consequence of that act." (*People v. Aznavoleh* (2012) 210 Cal.App.4th 1181, 1183.) The offense has long been classified as a general intent crime. (*Chance*, *supra*, 44 Cal.4th at p. 1167; *People v. Williams* (2001) 26 Cal.4th 779, 782 (*Williams*); *People v. Hood* (1969) 1 Cal.3d 444, 452-458 (*Hood*).) Section 29.4 makes evidence of voluntary intoxication inadmissible for the purpose of negating the required mental state for a general intent crime, including the element of knowledge. (§ 29.4, subd. (a).) "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required *specific intent*, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (*Id.*, subd. (b), italics added.) Accordingly, the California Supreme Court has held that "juries should not 'consider evidence of [a] defendant's intoxication in determining whether he committed assault.'" (*Williams*, *supra*, 26 Cal.4th at p. 788, citing *Hood*, *supra*, 1 Cal.3d at p. 459.) The statutory prohibition against admitting such evidence does not violate a defendant's constitutional right to present a defense. (*People v. Timms* (2007) 151 Cal.App.4th 1292, 1298-1300.)

Lucero argues that the holding in *Williams*, *supra*, is in tension with *People v. Mendoza* (1998) 18 Cal.4th 1114 (*Mendoza*) and *People v. Reyes* (1997) 52 Cal.App.4th 975 (*Reyes*) because the latter two cases recognize the admissibility of voluntary intoxication evidence to show that a defendant lacked sufficient knowledge to commit a crime. Both cases are distinguishable. The issue in *Mendoza* was whether evidence of voluntary intoxication can negate the mental state required for aiding and abetting liability. (*Mendoza*, *supra*, 18 Cal.4th at pp. 1123, 1126.) The opinion holds that aiding and abetting requires a specific intent for which evidence of voluntary intoxication is

14.

admissible under former section 22 [the predecessor statute of section 29.4]. (*Id*. at p. 1131.) In the *Reyes* opinion, the Fourth District held that voluntary intoxication is relevant to a charge of receiving stolen property because, "with regard to the element of knowledge, receiving stolen property is a 'specific intent crime,' as that term is used in [former] section 22, subdivision (b)…." (*Reyes*, *supra*, 52 Cal.App.4th at p. 985.) Here, since Lucero was charged as the direct perpetrator of a general intent crime, there was no legal basis for allowing him to inform the jury of his blood alcohol levels.

**Imposition of Sentencing Enhancements**

Section 1385 authorizes trial courts to strike prior felony conviction allegations in cases brought under the Three Strikes law if doing so will further the interests of justice. (§ 1385, subd. (a); *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 529-530 (*Romero*).) A request for this type of leniency is commonly referred to as a "*Romero* motion," even though defendants do not actually have a right to make motions under section 1385, subdivision (a). (*People v. Carmony* (2004) 33 Cal.4th 367, 375, 379 (*Carmony*).) Lucero's final claim on appeal concerns the trial court's denial of such a request at the time of sentencing.

The statutory scheme of the Three Strikes law "not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so. In doing so, the law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*Carmony*, *supra*, 33 Cal.4th at p. 378.) When presented with a *Romero* motion, the trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.) The refusal to strike a prior

15.

conviction is reviewed for abuse of discretion, which will only be found in "extraordinary" cases where the trial court's decision "is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, *supra*, 33 Cal.4th at pp. 377-378.)

Lucero's sentencing enhancements were based on a 1994 conviction for first degree burglary (§§ 459, 460, subd. (a)). In arguing for leniency under section 1385, Lucero emphasized the remoteness in time of the prior conviction and his desire to obtain treatment for his addiction to drugs and alcohol, which he identified as the root cause of the current offense. Two of appellant's family members also spoke to the court regarding his difficult upbringing in a dysfunctional and abusive household.

The prosecution's opposition to the *Romero* motion was based on the following facts and circumstances. In addition to the prior strike from 1994, Lucero was sentenced to prison in 2003 for a felony second degree burglary conviction and subsequently committed parole violations in February 2005 and June 2006. Lucero also failed to report to the probation department in February 2013 after he was unexpectedly released from custody pending sentencing due to overcrowding at the county jail. He then failed to appear for the originally scheduled sentencing date of February 27, 2013, and the matter was eventually continued until June 6, 2013. During his brief time out of custody in February of that year, Lucero admittedly consumed alcohol, methamphetamine, and heroin.

The trial court refused to dismiss the earlier strike because, in its words, "the defendant has not led a legally blameless life since the prior conviction…." Lucero claims this statement shows the court applied an "incorrect legal standard" and thus abused its discretion under section 1385. We reject his argument. A *Romero* motion may be denied without explanation and the ruling must be affirmed on appeal if the record shows the trial court "balanced the relevant facts and reached an impartial decision in conformity with the spirit of the [Three Strikes] law." (*Carmony*, *supra*, 33 Cal.4th at

16.

pp. 376, 378.)  The consideration of "impermissible factors" may constitute an abuse of discretion (*id.* at p. 378), but there is no evidence of that happening in this instance.

The trial court acknowledged considering the report of the probation department, as well as the comments made by counsel and others at the sentencing hearing, which collectively set forth the information summarized above.  In addition to referencing the defendant's failure to lead a "legally blameless life," the court expressly took into account that Lucero had been afforded multiple opportunities in the past to address his drug and alcohol addictions.  It is evident from the record that the court's ruling was partially based on other factors besides criminal recidivism, including Lucero's personal background and future prospects, which precludes a reversal for abuse of discretion.  (See *People v. Reyes* (1987) 195 Cal.App.3d 957, 963 [when a defendant's substance abuse problem was a substantial factor in the commission of the crime and he "has failed to deal with the problem despite repeated opportunities," the "need to protect the public from further crimes by that individual suggests that a longer sentence should be imposed, not a shorter sentence"].)

## DISPOSITION

The judgment is affirmed.


_____
GOMES, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
CORNELL, J.

17.